[No. 109.   Decided March 14, 1891.]

JOHN B. ROSE *v.* THE STATE OF WASHINGTON.

HOMICIDE — COMPETENCY OF JURORS — TESTIMONY OF ACCOMPLICE — CORROBORATION — EVIDENCE.

One called as a juror in a trial for murder who states that he has read accounts of the affair in the current newspapers, that he has talked with others in regard to it and heard them express opinions, that he has formed but not expressed an opinion of his own, and that his former impressions would have no influence upon him as a juror, is competent.

One called as a juror in a criminal case who states that he has formed an opinion as to the guilt or innocence of the accused which

it would take strong evidence to remove, but that he could lay aside his previous impressions and be governed by the evidence given at the trial and the law as charged by the court, is incompetent. (SCOTT, J., dissents.)

It is held in this case that the testimony of the accomplice charging the defendant with murder is untrustworthy and uncorroborated in any material fact, and therefore insufficient to support a conviction. (SCOTT, J., dissents.)

On a trial for murder, it is error to admit evidence that the defendant had stated, at the close of the preliminary examination, that his son had confessed to him the commission of the murder, as the accused was not on trial charged with knowingly concealing a murder committed by another. (SCOTT, J., dissents.)

*Appeal from Superior Court, Pacific County.*

The facts will be found fully stated in this opinion, together with the opinion in the case of *Edwards v. State, ante,* p. 291.

*Caples, Hurley & Allen, Kannaga, Holcomb & Elwood,* and *F. D. Winton,* for appellant.

*George J. Moody,* Prosecuting Attorney, *Fulton Brothers,* and *A. G. Hardesty,* for The State.

The opinion of the court was delivered by

STILES, J. — The separate trial of John B. Rose for the murder of Sina Frederickson occurred in the week following that of John Edwards, and with the same result. The testimony of George Rose was produced as before, and other witnesses were called to corroborate him. The same line of proof was followed, viz., that of showing expressions dropped by the accused, which, it was claimed, established a guilty knowledge on his part of the crime, and a participation in it.

Marion Bullard was called as a juror, and upon examination stated that he had read such accounts of the Frederickson affair as were published in the current newspapers; that he had talked with other persons in regard to it, and

heard them express opinions; that he had formed, but had not expressed, an impression or opinion of his own; but he further stated that his former impression would have no influence upon him as a juror, and would not cause him to construe the evidence upon the side to which his impression had previously leaned. A challenge for cause was denied, but we think the ruling was correct. Joseph Kaiser was another juror. He was a laborer on the farm of James Albright—one of the jurors on the trial of Edwards; talked with Albright and thirty or forty others about the case; read the newspapers, including accounts of the testimony before the coroner's jury, and at the preliminary examination; had to a certain extent formed an opinion as to the guilt or innocence of John B. Rose, which had not been changed; it was a confirmed opinion, which it would require evidence to remove; if sworn as a juror it would require strong evidence to remove his opinion as to the guilt or innocence of the defendant; he would be governed by the evidence as given at the trial, and the law as charged by the court; could lay aside all his previous impressions, but still had an opinion, though not a decided opinion. Defendant's challenge for cause was denied. This was error. The liberality of courts in the matter of accepting jurors who have read and heard of what purports to be the facts in a criminal case is very much greater than formerly, but they have not yet reached a point where one who states that he has an opinion which it would take evidence or strong evidence to remove can be taken as a juror in a criminal case where the life of a prisoner is in jeopardy. By the court's ruling the defense was compelled to peremptorily challenge the juror to avoid the danger of his presence with a fixed opinion in his mind. There must have existed in the opinion of the court, notwithstanding his assertion to the contrary, a doubt whether or not he could be fair, which should have been resolved in favor of the prisoner.

The testimony of George Rose was in every material respect the same as in the Edwards case, *ante*, p. 291, excepting that upon his cross-examination he made it clear that when, as alleged, the party, consisting of his father, Gibbons, Edwards, Frederickson and himself, left the Rose house to go down after the cattle, no member of the party carried or had mentioned in his hearing any gun or weapon of any kind; that he was the last to leave the yard with his shotgun, which was then unloaded; that without any suggestion from the others he carried the gun, and loaded it as he went; and that nothing was said about the gun until Gibbons took it to shoot the hawk. He also particularly described how he spent his time on Sunday and Monday, February 2d and 3d, when he was alone at the ranch, feeding the cattle, preparing his meals, and quietly reading a book. The name of the book he could not at first give, but finally said it was "Tennis." Counsel suggested "Tennyson," and he agreed that that was the name of it; but beyond that there were stories in "prose," which he afterwards changed to "poetry," he could not say what anything he read was about. He further said that Monday, February 3d, was a very stormy day.

In this case the corroboration was, if anything, weaker than in the Edwards case. John Anderson was active in raising a public subscription of money to employ a detective and a lawyer to investigate the disappearance of the Fredericksons, and went to Rose's house in South Bend to ask him to contribute. Rose was indignant; said he was being blamed for it, and would give nothing. He related what George had said about the Fredericksons going out and being lost on the bay, and appealed to George, who was present, to say if it was not true; and gave as a reason why the bodies did not float that other persons had been drowned there and never been found; his theory being that crabs or seals ate them. Many other people whom the witness met

had the same believe as to the drowning, and a number re-
fused to subscribe to the fund.    The sheriff arrested George
Rose in the presence of his father, at South Bend, and de-
scribed the old man as being very much agitated by it.
He was allowed by the sheriff to have an interview with
George in the presence of one Sweet and Elwood, an attor-
ney; and afterwards, when the sheriff was taking his pris-
oner to the boat for Bay Center, John Rose stepped up to
his son and said to him: "Now, George, don't you talk to
any one until you come up before the court, and then you
tell the truth.    You tell the court about seeing Frederick-
sons go out on that stormy day in the boat, and about a
storm coming up, and you thought they were drowned."
He asked permission to send a man along in the boat to
protect George from mob violence, and, being invited him-
self to go, replied that he dared not, as threats were being
made against his own life by persons who said they would
mob him if he went outside of South Bend.    Gibbons was
sent by Rose to do what he could for George.    The de-
fendant Rose left home on Sunday, February 2d, and went
to Oysterville to attend a session of the county commis-
sioners, and on his return from there visited a newspaper
office at South Bend, and told the persons he met there in
their conversation that his son George last week, at his
place near South Bend, had wounded a wild goose, and by
tying a string to its leg had caused it to attract others, so
that he was enabled to kill thirteen geese.    One witness
said he added: "I didn't know but what people would
think it strange there was so much shooting going on up
there, and I thought I would tell you what it is, so if there
is anything said about it you would know."    Another
witness said his remark was: "You needn't mention any
names in the paper," witness supposing it was given to
him as an item.    Another remembered his saying he
thought it was a pretty smart trick, but he did not want

anything said about it. Defendant maintained that he said this incident occurred "last fall" instead of last week, as the witnesses gave it. George Rose stated that in fact it did occur in November, 1889, and other witnesses showed that shooting on the flats at the mouth of the Willapa and on the bay was very common.

The testimony in regard to the finding of the alleged grave was repeated. One Prickett, who took the place of Edwards at the ranch, was called to relate a conversation between himself and Rose in regard to a rubber boot leg, the materiality of which was that Frederickson and everybody else down there uniformly wore rubber boots, Mrs. Frederickson having a pair of them on when she was found; and George Rose had reported finding a boot along the shore, which he had again thrown away. Rose asked Prickett to look up this boot, as well as all the other boots about there, and keep them for any search party that came along. Prickett found a boot top in the yard on the Rose place, and a number of other rubber boots in the same vicinity, and when he reported the finding of the boot top to Rose, the latter said: "Was the top cut off that boot?" Witness told him it was, when he asked further: "Didn't you or your boy cut it off?" Prickett answered, "No." Then Rose said: "You or your boy must have cut it off." This boot leg was produced at the trial, and three small spots were pointed out on it as being blood spots. The ingenuity of counsel may have shown this testimony to have been material, but unless it was Frederickson's boot, which nowhere appears, and unless the spots were human blood, which was not attempted to be shown, there seems to have been nothing connected with it of any importance. Many old boots were scattered around there, and cattle were killed near by every day. The witness who testified to this, although in Rose's employ, was in fact employed by the authorities to watch him, talk with him, and report

anything that might escape him. At first the witness said Rose's last remark was: "You must say you cut it off;" but on cross-examination he admitted that he was considerably excited, and that it might be as given above.

At the close of the preliminary examination before a magistrate, according to one of the witnesses, who was among the guard employed by the sheriff, the defendant said he knew George had committed the murder, as he had confessed it to him; that he had got on a drunk and killed them. The state, using Rose's testimony in the Edwards trial as evidence in chief, had already put in a contradiction by Rose of this alleged conversation. Counsel for the defense strenuously objected to the admission of this testimony, and we think it was error to admit it. The accused was there to meet the charge that he was guilty of the murder by being present and assisting in it; not the charge of knowingly concealing a murder committed by some other person. Taking the testimony of the witness as true, the offense of the father in covering his son's crime was only a misdemeanor under the statute.

The defense rested mainly upon the *alibi*, as in the Edwards case; but there were some features of both cases which we shall notice here. Witnesses outside of the family of the Roses, and who were not shown to have had any connection with them, testified that they knew John B. Rose to have been confined to his room with illness from Sunday, March 26th, to Friday, the 31st; that George Rose was hauling wood on Thursday, the 30th, in the forenoon, from back of the hotel in South Bend to the hotel, and in the afternoon, among other things, went on an errand to the stores, to get ham for a dancing party to be given the school mistress on Friday evening; that in the evening of the same day, from after supper time until late, Frances, the school mistress, George and another young man were in the kitchen making cakes for the party; that on Fri-

day Rose and his wife, during the day, went into the village, and executed and acknowledged a deed of real estate; that Friday forenoon George was engaged clearing out of a new building the *debris* left by carpenters, to prepare the floor for dancing; that in the afternoon he attended the school exhibition, with many others; that the dancing party occurred at the Rose house on Friday night; that on Saturday George went in a boat with another man down to the ranch, and they, with Edwards, killed a beef, and dressed it, and remained there over night, returning to South Bend early Sunday morning; that on Sunday, Rose, Edwards and the school mistress took the boat and went to Oysterville and beyond, Rose and Edwards being absent several days; that during the day George was about the saloons and was drinking; that in the afternoon about 4 or 5 o'clock he bought a pint bottle of whisky, took it and his gun, and left in his boat for the ranch; and that he did not appear again until Tuesday, when he paid for the whisky with a $10 gold piece. Two witnesses testified to having seen George on Sunday night, in a wash-room in the rear of his father's house; that they spoke to him and that he then told them he had seen the Fredericksons go out in their boat, but that they disappeared in a squall, and he supposed they were lost. He said he must go to the ranch early in the morning on business. Frances Rose denied having at any time got supper for her father, Gibbons and George, or any of them, as stated by George.

In response to the testimony of the defense, above epitomized, George gave a flat denial wherever Thursday was included, and also denied having bought the bottle of whisky, and his having been seen on Sunday night. On the day after George made his last written statement, which implicated his father, Gibbons and Edwards, counsel for the defense, having heard that he had made such a statement,

went to the jail to have an interview with him, and there George said to him, referring to the murder:

"I done it myself, and I will just tell you how it was. The school ma'am left here Sunday, the 2d day of February. I was feeling a little blue, and I got full that day. I stayed around town till almost dark. Kept drinking all day. About dark I got a quart bottle of whisky, and started for the farm. Going down to the farm I made up my mind to kill Frederickson. I went to bed that night, and got up in the morning with my head feeling pretty bad. I remember that I had made up my mind to kill Frederickson, and then thought I would not do it. I drank all of the quart bottle of whisky that I had brought down with me during the first two hours after I got up, and then made up my mind that I would kill Frederickson. I was drunk, or I would not have done it. I took the shotgun, and put two cartridges into it, and three more into my pocket, which was all the cartridges I had for the shotgun. I then went to Frederickson's house and told Frederickson that a calf had got its leg between two logs, and that I could not get the logs apart alone, and that I wished he would go with me, and help get the calf out. He went with me. I was ahead, and he followed after me along the trail. When I got over the log where Frederickson's body was found, I turned around, and Frederickson was just getting onto the log. I said, 'Look here, Frederickson.' I had the gun all ready, and, as he looked up, I fired. The charge struck him just below the eye. He dropped down dead. I looked at him a minute and thought that was a pretty tough way to do business. I started for home, and I thought I had better do some more shooting, to make people think that I was out hunting; so I shot away the rest of the cartridges I had with me. This was before dinner. I waited around the house an hour or two. I then thought I would have to kill Mrs. Frederickson, because she had seen Frederickson go away from the house with me, and when he didn't come back, there would be trouble. I had no more cartridges for the shotgun, so I took the rifle and put a cartridge into it, and several more in my pocket, and went down to Frederickson's house, and

told Mrs. Frederickson he had broken his leg, and that I could not get him home; that he wanted her to come right up to the house. She put on her rubber boots and started along with me. When we got up near our hog-pen she seemed to think something was wrong, and she said she would not go any further until I told her what I had done with her husband. I told her I had killed him. She said if I had killed her husband I might as well kill her, too; so I took the rifle, and held it close to her temple. She never moved a muscle. I fired, and she fell dead. I then took the gun back to the house, and waited until almost dark. I made up my mind it was a bad job, and that there had got to be something done; so I went and buried Mrs. Frederickson under the manure pile at the hog-pen. I went into the house, and stayed there all night. Next morning I went out to where Frederickson's body was, and buried it just where it laid. I then went to South Bend and told the folks that I had seen the Fredericksons leave in a dingey. That shortly after they left there came up a terrible squall, and after the squall was over I could see nothing more of the dingey, and I thought the dingey had got swamped, and they were drowned. After I had killed Frederickson I took what money he had out of his pocket. There was $59.50. It was out of that money I bought several chances in the sealskin raffle. Father asked me where I got so much money, and I told him that the South Bend Land Company owed me for work that I had done for them the fall before, and that they had paid me."

And being asked why he had made the statement implicating the others, he said that he had told the authorities the story repeated above, but that they said if he persisted in telling that story they would have nothing more to do with him; that they knew that the other parties arrested were implicated in the murder with him; and that if he told the truth and implicated the others they would do all they could.

In this case, as was before remarked, the corroborative testimony was even weaker than in the Edwards case. The father may have been agitated over his son's arrest for

so heinous a crime. It would be strange if he were not. He may have refused contributions; he may have thought his son smart as a goose hunter; he may have received the confession of his son's guilt; he might have cautioned him to say nothing, or tell the story he had told before, even knowing it to be false; he might send some one friendly to be near in case of mob violence; but how, to the unbiased mind, do any of these things tend to show that George Rose's most remarkable story was true in its material part, wherein it charged his father with participation in this murder? We are unable to see that it should even create a suspicion. The motive assigned, viz., the desire to obtain the Frederickson land, amounted to this: The land was almost worthless for any purpose in itself, and it had lain for years, with occasional claimants who abandoned it. Rose had himself told one or more parties of its condition, and offered to show it to them if they wished to take it up; but he had made no move towards acquiring it himself, until, as his son charged, he found it necessary to employ assassins to destroy a threatened claim upon it. The duty of this court in the premises is too clear for doubt. The appellant must have a new trial, and it is so ordered.

Anders, C. J., and Dunbar, J., concur.

Scott, J. (*dissenting*). — I dissent. All the reasons given for dissenting in the Edwards case, *ante*, p. 291, are applicable here. The record discloses no error in law, and the basis for a reversal can only be upon the insufficiency of the evidence. The juror, Joseph Kaiser, spoken of, said he could give the defendant a fair and impartial trial upon the evidence, and the defendant's peremptory challenges were not nearly all exhausted. No point was raised by appellant as to the proof of his statement, made at the preliminary examination, that he knew George committed the

murders, and it was admissible in any event as tending to show the guilt of the accused. Nor do I agree to the statement that the corroborating evidence was weaker than in the Edwards case. The testimony given upon the part of the defense, as stated in the majority opinion, is largely susceptible of explanation, and the corroborating testimony is not fully shown.