[No. 1411.   Decided December 11, 1895.]

THE STATE OF WASHINGTON, *Respondent*, v. SERVIUS
RUTTEN, *Appellant*.

CRIMINAL LAW — JURORS — CHALLENGE FOR CAUSE — BIAS — EXAMINA-
TION OF WITNESS — INSTRUCTIONS — MURDER IN FIRST DEGREE.

A refusal to sustain challenges for proper cause, necessitating
peremptory challenges on the part of the accused, will be consid-
ered on appeal as prejudicial, where the accused has been compelled
subsequently to exhaust all his peremptory challenges before the
final selection of the jury.

Where a juror admits that he has an opinion as to the guilt of
the accused, which it would take evidence to remove, that he be-
lieves there was something wrong and he could not go into the jury
box and accord the accused the presumption that he was innocent,
until he was proven guilty, he should be excused upon a challenge
for cause, although he may state in answer to leading questions by
the court and the prosecuting attorney that if he was charged as the
defendant was he would be willing under the same circumstances to
have twelve men try his case who were of the same mind as he was.

The discretion of the trial court to determine the question of par-
tiality or impartiality of a juror is subject to review by the appellate
court, under the constitutional guaranty to the accused of trial by
an impartial jury.

Refusal of the court upon its own motion to permit defendant's
counsel in a murder case to ask a witness on cross-examination
whether he is testifying by guess or by his own knowledge is preju-
dicial error, when the case is close to the border line between mur-
der and manslaughter, and the witness was careless in his manner
of testifying, often using the words "I guess," when rehearsing
statements of fact.

· The court may properly refuse to instruct in any particular form
of words, if the substance of the requested instruction has already
been given.

*Semble*, That an instruction in a prosecution for murder which
informs the jury that it is not necessary to constitute murder in the
first degree that any appreciable space of time should elapse be-
tween the formation of the intention to kill and the killing, but they
may be as instantaneous as successive thoughts, is erroneous under
our statutes, as it eliminates the element of deliberation which dis-
tinguishes murder in the first degree from murder in the second
degree.

Appeal from Superior Court, Kitsap County.—Hon. John C. Denney, Judge.    Reversed.

*H. E. Shields* (*John K. Brown,* of counsel), for appellant.

*J. B. Yakey,* Prosecuting Attorney, for The State.

The opinion of the court was delivered by

Dunbar, J.—The appellant was convicted of murder in the first degree in the superior court of Kitsap county and sentenced to be executed, and from such judgment he has appealed to this court.    The first assignment of error by the appellant, viz., that he is entitled to trial by a panel of jurors drawn by the county commissioners for the year 1894, we think was decided adversely to appellant's contention in *State v. Krug,* 12 Wash. 288 (41 Pac. 126).

The next contention is that the court erred in overruling the appellant's challenge to the jurors Denniston, Greene and Stark.    All these jurors were peremptorily challenged by appellant after the refusal of the court to sustain challenge for cause, but the record shows that the appellant exhausted all his peremptory challenges, and if the court wrongfully compelled him to exhaust peremptory challenges on jurors who should have been dismissed for cause, his rights were invaded as much as though the jurors had been accepted after his peremptory challenges were exhausted, so that the question must be considered with reference to the qualifications of these jurors.    The first juror mentioned, viz., Denniston, in reply to the question, " Have you an opinion as to the guilt or innocence of this man Rutten? " answered, " I think I have," and stated that he had formed such opinion from articles that he had read in the newspapers.    He also

stated that he could not say that he could be governed entirely by the evidence that was brought forward in the case. This was on direct examination. On his cross-examination he stated that these articles had made an impression upon his mind as to the guilt or innocence of the defendant, and if the man who was being tried was the man who did the killing, then he should have an opinion. In this case it was conceded that the man who was being tried was the man who did the killing. A great many of the ordinary questions indulged in upon such occasions were indulged in here, and the court finally asked the witness the following question: "If you were on trial for your life for the crime of murder in the first degree, would you be willing to be tried by twelve men who felt towards you and your case as you do towards this defendant and his case; would you feel safe to be tried by twelve men?" to which question the juror answered, "I would," whereupon the court denied the challenge.

During the examination-in-chief of juror Greene, the following colloquy occurred:

"*Question.* Have you formed or expressed any opinion as to the guilt or innocence of this defendant? A. I have.

"Q. Have you such an opinion at the present time? A. Well, it has not been changed, sir.

"Q. Would it require evidence to remove that opinion? A. It would.

"Q. From what did you form that opinion? A. From what I heard and read."

Witness then, in response to the leading question asking him, if he did not think he could sit upon the jury and give this defendant a fair and impartial trial, answered that he could. Upon the cross-examination, the following testimony was given:

"*Question.* You did form an opinion? A. I did.

"Q. Still have that opinion, have you? A. Certainly.

"Q. That is as to the guilt or innocence of the defendant? A. Yes, sir.

"Q. You say it would take evidence to remove that opinion that you now have? A. It would.

"Q. Take strong evidence to remove that opinion, would it? A. It would take evidence."

Then the question was asked the witness, if he was on trial for his life if he would be willing to be tried by twelve jurymen who felt towards him as he felt towards the witness, the defendant in this case, and he answered that he would, and the court refused the challange.

The juror Stark stated in answer to questions on direct examination that he had an impression,— that it was an impression it would take evidence to remove; that he had such an impression yet,— but finally stated that he could sit in the case and give defendant a fair and impartial trial without reference to the opinion that he entertained. On cross-examination he stated that he had read an account of the murder in the papers, and had heard the matter frequently discussed among the people in the neighborhood of the murder, and reiterated that he had an impression in regard to the guilt or innocence of the defendant. When asked to define the difference between an impression and opinion, he answered: "Well, my idea of an impression is to give it all the credit it is worthy of until I know something different; an opinion should be, in my judgment, based upon proof of the facts in the case." Strictly construed the juror's idea of an impression was simply a *prima facie* opinion. After some further cross-examination, the following occurred:

"*Question.* And then it would take evidence to re-

move that impression, would it not?  A. I think so.
"Q. It would take pretty strong evidence to remove
the impression, would it not?  A. Well, conclusive."

Whereupon the defendant challenged the juror for
cause.  The re-direct examination elicited the usual
reply, that the opinion that the juror entertained was
not such an opinion as would prevent him from sit-
ting on the case and giving the defendant a fair and
impartial trial on the law and the evidence, and the
stereotyped question was asked him, whether, if he
was charged as the defendant was, he would be will-
ing to have twelve men try his case who were of the
same mind that he was, and he answered that he
would be willing to risk his case under the same cir-
cumstances.  The counsel for the state then asked
him: "Would you go into the jury box with a pre-
sumption that he was innocent until the state had
proven him guilty beyond a reasonable doubt? "  The
answer was, " No, I am under the impression that
there is something wrong."  The challenge of this
juror was finally overruled by the court.

It seems to us that, when the juror answered the
last question in the manner in which he did, the chal-
lenge should at once have been sustained, for, notwith-
standing the subsequent assertion of the juror that he
could try the defendant and accord to him the pre-
sumption of innocence he was entitled to under law,
he had already stated in plain terms that he would
not go into the jury box with a presumption that the
defendant was innocent until the state had proven
him guilty, for the reason that he was satisfied that
there was something wrong.  In this case, three jurors
admitted that they had formed opinions; that that
opinion existed with them at the time of their exam-
ination, and that it would take evidence to remove

such opinion, and the final announcement by the juror under leading questions by the court and by the attorney for the state which plainly indicated to the jurors what answer was expected of them, will not outweigh the deliberate statement they made of their own free will, uninfluenced by leading questions, that they had opinions in regard to the guilt or innocence of the accused which it would take evidence to remove, and especially when it was announced, as by the juror Stark, that he believed there was something wrong, and that he could not go into the jury box and accord to the defendant the presumption that he was innocent until he was proven guilty. While the statute gives to the court the right to determine the question of the impartiality of the juror, yet, this being a constitutional right, this court will review the discretion of the lower court in passing upon this question; and from the whole of the examination of these jurors, and especially juror Stark, we are satisfied that the right of the defendant to be tried by an impartial jury was invaded; that the case falls within the rule announced in *State v. Murphy*, 9 Wash. 204 (37 Pac. 420), and *State v. Wilcox*, 11 Wash. 215 (39 Pac. 368), where the reason of the rule was fully discussed, and that for that reason the judgment must be reversed.

There is another matter in which it seems to us the court erred, and that is in refusing to permit the defendant's counsel to ask the witness Albertson on cross-examination the question: "Are you testifying by guess or testifying of what you know?" It was suggested on the argument of the case that this was a badgering question, not intended to elicit the truth, but simply to annoy and embarrass the witness. The record does not satisfy us that such was the case, but, on the other hand, the record shows that the witness

had a very careless manner of testifying, and frequently used the words "I guess" when he was rehearsing statements of fact. This character of testimony had been unobjected to by defendant's counsel, and no attempt had been made to badger the witness or to call upon him for an explanation until the following occurred:

"*Question:* Now, what was the first words that you heard spoken when you arrived within hearing distance? *Answer:* Billy told him to come up; that was the first I heard.

"Q. Use the exact language. A. That was, he says, 'Come up here.'

"Q. Billy says, 'Come up here?' A. Yes.

"Q. Billy,—to whom? A. To Mr. Rutten.

"Q. How do you know? A. Well, somebody inside of the cabin; I don't know exactly.

"Q. Do you know whether it was Mr. Rutten, or who it was, do you know? A. That was the gentleman he was referring to, I guess.

"Q. How do you know it was? A. I don't know exactly.

"Q. Well, are you testifying by guess or testifying of what you know? A. (No answer).

"The court: Answer the question.

"(Question read).

"A. Well, I ——.

"The court: Well, proceed with another question.

"Mr. Shields (attorney for defense). It is a very simple question, your honor.

"The court: Yes, sir, but it is very immaterial, too (exception)."

We do not think that the question was immaterial. This case was very close to the border line between manslaughter and murder, or at least murder in the second degree, and murder in the first degree and every circumstance connected with the quarrel between these two men which was being related by this

witness was very material. No objection was made to the interrogatory by the state's attorney, and we think the court should have permitted the question to have been asked. The defense had a right on cross-examination to ask any question which would tend to test the accuracy or veracity of the witness, and cross-examination is as important to test the accuracy of testimony as its truthfulness or credibility, and prejudice will be presumed when this right is denied. The value of cross-examination as a test of information would be lost in the case of either a dishonest, or an unreliable, or a careless witness, if such questions were not allowed,— in fact, the main purpose of cross-examination is to determine the correctness of the statements made in chief, and certainly it was important for the jury to understand whether this witness was testifying concerning actual facts or whether he was giving his deductions from facts which were not made known to the jury. Even in a civil action, we think the question asked by the defendant's counsel would have been proper and pertinent, and where a man is being tried for his life, certainly the right to determine through the medium of cross-examination the exact knowledge of the witness or the accuracy of his statements, should not be denied him.

There are many other assignments of error, but we think they are not substantial or meritorious. The instructions which were asked for by the defendant had been substantially given by the court in its original charge to the jury, and we have held in numerous cases that a court will not be compelled to instruct in any particular form of words where the substance of the instruction asked for has already been given. In view of the facts, however, that there will in all probability be a new trial of this case, and that

the same instructions are liable to be given by the
court, we think it best to speak in an advisory way of
certain instructions which were given by the court
and which were not excepted to by the appellant.
Our statute (Penal Code, § 1) defines murder in the
first degree as follows:

" Every person who shall purposely, and of deliber-
ate and premeditated malice,    .   .   .   kill another,
shall be deemed guilty of murder in the first degree,
.   .   .   ."

And murder in the second degree is defined as fol-
lows (Penal Code, § 3):

" Every person who shall purposely and maliciously,
but without deliberation and premeditation, kill an-
other, every such person shall be deemed guilty of
murder in the second degree,   .   .   .   ."

The court properly instructed the jury, after recit-
ing the statute, that the main distinction between
murder in the first degree and murder in the second
degree was the presence or absence of premeditation
or deliberation.   In the sixteenth count of the charge,
the court said:

" Premeditated malice is where the intention to
unlawfully take life is deliberately formed in the
mind, and that determination meditated upon before
the fatal stroke is given.   There need not be any ap-
preciable space of time between the formation of
intention to kill and killing.   They may be as instan-
taneous as successive thoughts.   It is only necessary
that the act of killing be preceded by the concurrence
of will, deliberation and premeditation on the part of
the slayer."

And in count twenty-one, the court again said:

" In deliberating, there need be no appreciable
space of time between the intention to kill and the
act of killing; that may be as instantaneous as the

successive thoughts of the mind.    It is only necessary
that the act of killing be preceded by a concurrence
of will, deliberated and premeditated on the part of
the slayer; and if such is the case, the killing is mur-
der in the first degree, no matter how rapidly the acts
of the mind may succeed each other, or how quickly
they may be followed by the act of killing."

It seems to us that the language used wipes out the
distinction made in the statute between murder in
the first and second degree.    While no great amount
of time necessarily intervenes between the intention
to kill and the act of killing, yet, under our statute
there must be time enough to deliberate, and no de-
liberation can be instantaneous; in fact, the idea of
deliberation is the distinguishing idea between mur-
der in the first and second degree, and the instruc-
tions of the court which we have quoted give exactly
that which would be necessary to define murder in
the second degree, because the intention to kill must
be in the mind of the slayer, and he must do it pur-
posely and maliciously; consequently the act of killing
must be preceded by the purpose to kill, and it must
be a malicious purpose, and that purpose may be
formed instantaneously, or as expressed by the learned
court below, ". as instantaneous as the successive
thoughts of the mind," and under the old definition of
murder, viz., the unlawful killing of any subject
whatsoever through malice aforethought, that would
be a proper instruction in regard to murder; but our
statute has changed the law in this respect, and has in-
troduced the element of deliberation, and deliberation
means to weigh in the mind, to consider the reasons
for and against, and consider maturely, to reflect
upon,—and while it may be difficult to determine
just how short a time it will require for the mind to
deliberate, yet, if any effect is to be given to the

statute which makes a difference between murder in the first and second degree, the language used by the learned court is too broad.

This charge not having been excepted to, the case of course will not be reversed for that reason; but on account of the other errors which we have mentioned, the cause will be reversed and remanded with instructions to grant the appellant a new trial.

ANDERS and SCOTT, JJ., concur.

GORDON J., (*concurring*).— I concur in the result for the sole reason that in my opinion the constitutional right of the defendant to be tried "by an impartial jury" was violated.

HOYT, C. J. (*dissenting*).—For reasons briefly stated in the case of *State v. Wilcox*, 11 Wash. 215 (39 Pac. 368), I dissent.