[No. 3825.   Decided April 4, 1901.]

# THE STATE OF WASHINGTON, *Respondent*, v. FRANK ROYSE, *Appellant*.

CRIMINAL LAW — EXAMINATION OF JURORS — IMPRESSION OF GUILT.

Where a juror states on his *voir dire* that he has no opinion as to the guilt or innocence of accused, but that he has some slight impression on the subject from having heard the case discussed by persons who did not claim to know the facts, and that such impression would readily yield to testimony, he is not disqualified on the ground of actual bias.

SAME — DIFFERENCE BETWEEN OPINION AND IMPRESSION.

When an attorney in examining a juror as to his qualifications states that there is no difference between having an opinion and an impression as to defendant's guilt or innocence, it is a misstatement of the law, and it is not error for the court to interfere with the examination for the purpose of correcting the statement and instructing the juror to the contrary.

SAME — PREJUDICE — DRUNKENNESS.

In examining a juror as to whether or not he was prejudiced against the defenses of drunkenness and insanity, a question to the juror as to which side he would find on, if the evidence as to drunkenness should be equally balanced, was properly excluded, on the ground that it presented a question of law, upon which it was the court's duty to instruct the jury.

SAME — HARMLESS ERROR.

The refusal of the court to permit counsel to ask a juror whether he would look upon the defense of intoxication with any degree of disfavor, if error at all, was cured by permitting counsel subsequently to propound the question, "should the defense consist in part of emotional or hereditary insanity, aggravated, inflamed, and rendered acute by the excessive use of intoxicating liquors, would you regard that kind of defense with any disfavor or prejudice"?

SAME — HEREDITARY INSANITY.

Although a juror, when asked if he had any prejudice against the defense of drunkenness or insanity, answered that to a certain extent he had, yet his exclusion on the ground of prejudice was properly denied, when his examination, taken as a whole, merely shows that he did not approve of drunkenness, and, in

answer to questions by the court, he said that he could give that defense due effect and pass upon it the same as he would any other defense, and that it would not require any different evidence to prove it than would any other defense.

SAME.

Where one of the defenses in a criminal case was hereditary insanity, a juror was not disqualified by reason of stating he did not believe in hereditary insanity, when his examination as a whole showed that he did not mean to take that position, but that the defense would have to be proven before he would believe it.

Appeal from Superior Court, Walla Walla County.— Hon. THOMAS H. BRENTS, Judge. Affirmed.

*W. T. Dovell,* for appellant.

*Oscar Cain,* Prosecuting Attorney, for the State.

The opinion of the court was delivered by

DUNBAR, J.—The defendant was tried on information for murder in the first degree, and was found guilty of murder in the second degree. Many errors are alleged which we will not be able to follow in their order, but will undertake to answer in groups as they are presented by the appellant.

Error in refusing to sustain challenges to several jurors, which we will discuss more or less together: The first challenge which the court refused to sustain, and which is alleged as error, relates to juror Cochran. In order that the attitude of the juror may be shown exactly, we will set forth his testimony in detail, as follows:

"Question. Do you know anything about the facts in this case, Mr. Cochran?

Answer. No, sir.

Q. Were you living in this county on the 8th of February, 1900?

A. Yes, sir.

Q. Do you know the defendant, Frank Royse?

A. No, sir.

Q. I will ask you if at the time the crime is charged to have been committed you heard or read anything concerning it?

A. I was at the ranch.

Q. I will ask you if you heard, at the time, of it?

A. I heard different ones passing opinions, passing around.

Q. Were those persons you heard passing opinions and discussing it generally, persons claiming to know the facts in the case?

A. No, sir.

Q. Have you since the time the crime is charged to have been committed, heard it discussed by any one claiming to know the facts?

A. No, sir.

Q. I will ask you if, in case you were permitted to sit upon this jury, you could entirely lay aside what you have heard concerning this case and try it wholly upon the evidence and the instructions of the court?

A. Yes, sir.

Q. I will ask you if you have any opinion as to the guilt or innocence of the defendant?

A. No, I do not think I have, neither one way or the other.

Q. You feel confident that you have no opinion?

A. Not any further than just what I have heard; I don't know whether you would call it an opinion or not.

Q. I will ask you if your opinions are such as would preclude you from finding a man guilty of an offense where the penalty is death?

A. No, sir.

CROSS-EXAMINATION.

Q. Did you ever hear any one who expressed an opinion on the case one way or the other?

A. Just around town.

Q. You heard people around town express an opinion?

A. Some one way and some another.

Q. What newspaper accounts did you read?

A. I seen a piece in—I think in the *Telegram,* about something near three weeks afterwards.

Q. Did you read the local papers' accounts of it?

A. I do not read the local papers.

Q. Have you read anything recently with reference to it?

A. No, sir.

Q. Now, from all you have heard and read, from all you know of Benjamin F. Royse in his lifetime and from all the information you have on the subject up to the present date, have you any opinion, however slight, as to the merits of this case, as to the guilt or innocence of this defendant of the crime with which he is charged?

A. No, I cannot say that I have an opinion one way or the other.

Q. Have you any doubt in your mind whether you are entirely free from an opinion or not, or an impression, either one—one is the same as the other in my way of thinking?

The Court: The court will say to the juror that there is a difference between an impression and an opinion as a matter of law. If counsel instructs the juror to the contrary I will overrule it.

Mr. Griffitts: I will except to the court differing with me in that way.

Q. Now, say whether you have an opinion or not.

A. Well, I can have an impression slightly.

Q. Is that impression such as would require some evidence to remove?

A. No, sir.

Q. It would not take any to remove it?

A. Very little.

Q. What kind of evidence would remove that impression?

A. Any eye-witness would remove it.

Q. The testimony of any eye-witness?

A. Yes, sir.

Q. That is, the sworn testimony of any eye-witness?

A. Yes, sir.

Q. It would take the testimony of a sworn eye-witness to remove it?

A. Yes, I should want an eye-witness to remove it.

Q. You would want the testimony of an eye-witness to remove it?

A. Yes, sir.

Q. Otherwise you would keep it? You would keep it; it would require the testimony of an eye-witness to remove it?

A. Yes, sir; as far as I know.

Q. Should you be taken and sworn as a juror, and should the defense of the defendant consist in part of drunkenness to such an extent as to render him in law incapable of committing the crime of murder, have you any feeling, prejudice, or bias of any kind that would prevent you from giving to that defense the same fair, just, and honest verdict you would give any other defense?

A. I should give him the same.

Q. I will ask you the same question with reference to emotional and hereditary insanity.

A. It would have its weight.

Q. That is not a satisfactory answer. That is to say, if you believed he was crazy at the time you would not convict him, is that it?

A. That is my impression; yes, sir.

Q. Now, following up that notion you have, suppose that defense consisted in part of emotional and hereditary insanity, aggravated and rendered acute, as the doctors say, by drunkenness; would you give as fair treatment to that as any other defense in the world?

A. Yes, sir.

Q. You have no doubt of your ability to do so?

A. No; not at all.

Q. And if you were taken and accepted and sworn as a juror here you could and would, so far as the defense of emotional or hereditary insanity or drunkenness is concerned, try this defendant as fairly and impartially as any other case in the world?

A. Yes, sir.

(Here the juror is challenged by the defense for actual bias.)

The Court: Would the statement of any eye-witness remove the impression you have?

A. Yes, sir.

The Court: Would you require it to be sworn to?

A. No, sir; because I have nothing but hearsay.

Mr. Griffitts: I would like to ask one question suggested by the court's question.

Q. (Griffitts) That is to say, the statement of an eye-witness, although not sworn, whom you believed, would remove it?

A. Yes, sir.

Q. It would have to be such an eye-witness as you believed?

A. Why, I would want somebody that knew something and whom I believed on the other side.

Q. Somebody whom you could believe and knew?

A. Yes, sir."

The challenge was renewed, and overruled by the court. It is evident from the examination that this witness did not have such an opinion of the guilt or innocence of the accused as ought to preclude him from sitting on the jury. It is true this court has frequently decided that where a juror has testified that he had an opinion, and afterwards upon an examination by the court or the prosecuting attorney, stated that he could disregard that opinion and try the case upon the facts presented and the law as given him by the court, such a juror ought not to be imposed upon the defendant, for the reason that a man is not able to determine whether he can lay aside or disregard opinions which he possesses, and that it is the constitutional right of a defendant to be tried by a juror who is absolutely impartial; and this doctrine we adhere to. But it must appear that the juror has an opinion upon the question of the guilt or innocence of the defendant, and not a

mere impression from remarks which he has heard without having determined whether such remarks are true or untrue. In discussing this question of impression, it was said by this court in *State v. Krug,* 12 Wash. 288 (41 Pac. 126):

"The word 'impression,' if it can properly·be applied to a mental operation, does not reach the strength of an opinion. An opinion is a conviction which is based, and must be based, upon testimony. An impression is a mere fancy, or lodgment in the mind which is not based upon testimony, and the existence of which cannot be traced to proof."

Applying this distinction to the juror whom we are now considering, he nowhere testifies that he had heard the pros and cons of the case or that he had weighed the testimony or come to any conclusion from anything that purported to be testimony in relation to the guilt or innocence of the defendant. He stated at the outset that he had not heard the case discussed by any one who claimed to know the facts concerning it, and that he did not have any opinion one way or the other. It is the voluntary information given by a juror which tests his suitability, rather than answers that are elicited by adroit and confusing questions. Witnesses are frequently made to say things exactly opposite from what they mean, and, having once made a mistake, their subsequent answers simply exhibit more confusion and excitement. The object of cross examination is to elicit the truth and not to elicit that which is not the truth. From the whole testimony it plainly appears that the juror was qualified.

The appellant also complains of the statement of the court in correcting the attorney in his statement to the juror, as set forth above, in relation to the difference between an impression and an opinion. In the first place, the question asked was not a proper one for the attorney for

the defense to ask a juror, or, rather, the attorney should
not have stated to the juror in his question what his view
was of the difference or lack of difference between impres-
sions and opinions.  In the second place, it was not a cor-
rect statement of the law as announced by this court in
*State v. Krug, supra,* and the court was justified in cor-
recting the attorney in that respect.

The same thing may be said in relation to the examina-
nation of jurors, Paul, Zaring, and Campbell.  Excerpts
from the testimony of each might lead to the con-
clusion that these jurors had opinions which should pre-
clude them from sitting on the jury, but their examina-
tions by both the state and the defense, when viewed as
a whole,—and they must be so viewed to arrive at a prop-
er determination,—show that in neither  instance  was
there an opinion entertained which would prejudice the
rights of the defendant.  It is not hard to discern that
when the jurors talked about opinions, they were talking
about mere rumors which they had heard in relation to the
crime.  None of them had heard anything said in relation
to the crime by any one who professed to relate the facts
from any knowledge thereof.  It was simply newspaper no-
tice and neighborhood talk.  It did not appear in any in-
stance that any one who knew anything about the
facts, or who professed to know anything about them, had
attempted to relate the facts to the jurors.  There was no
indication that these men were prejudiced, for or against
the defendant, to the slightest extent, and, unless it ap-
pears from the whole examination that a juror actually en-
tertains an opinion in relation to the guilt or innocence
of the defendant, he cannot be excluded for actual bias.

Assignments 9, 10, 11 and 12 relate to the refusal of
the court to permit defendant's counsel to examine jurors
Murphy, Bowers, and Williams upon their *voir dire* as

to whether or not they were prejudiced against the defenses of drunkenness and insanity. During the examination of juror Murphy he was asked this question:

"Now, if the evidence as to his drunkenness should be equally balanced, which side would you find on?

The Court: That is a question of law. I will instruct him later in regard to that point. I will ask him whether he would follow the instructions of the court upon that point as to the quantity of evidence that would be necessary to convict.

Juror: Yes, sir.

Mr. Griffitts: Does the court disallow my question?

The Court: I substitute mine."

To which an exception was taken. We do not think that this was a proper question to ask the juror. As the court remarked, the amount of testimony which it will take to convict is a question of law to be given the jury by the court, and there is ample opportunity to test the prejudice of jurors on questions of this kind without submitting legal propositions to them. During the course of the examination of the juror Bowers the following occurred:

"Q. If the defense in this case should consist in part of drunkenness, that is, an allegation that the defendant at the time of the alleged commission of the offense, if any was committed, by the defendant, he was so drunk from the excessive use of intoxicating liquors as to not know what he was about and was in law irresponsible for his acts, would you look upon such a defense with any degree of disfavor?

A. I would abide by the law.

Q. Would you regard such a defense as that with any degree of disfavor?

A. I don't favor drunkenness.

Q. Still you have not answered the question, would you regard the defense with any degree of disfavor?

The Court: Would you consider that defense, if the court told you it was a defense; would you give it the same consideration as any other defense? If the court told you this was a good defense, would you give it the same consideration as any other defense?

A. Yes, sir.

Mr. Griffitts: If it please the court, I insist upon an answer to my question—whether or not he would regard such a defense with any degree of disfavor?

The Court: I think he has answered what the law contemplates by the question.

Mr. Griffitts: Then the court disallows the question.

The Court: Yes, I disallow that question, in that form."

We think again that the question, "Would you regard such a defense as that with any degree of disfavor?" was indefinite and misleading, and when the witness answered the question by saying he would abide by the law it was a sufficient answer to the question, faulty as it was. In no event, however, was the defendant prejudiced by the acts of the court, conceding that it was a proper question; for, after the colloquy above described, counsel for the defense propounded the following question: "Should the defense consist in part of emotional or hereditary insanity, have you any bias or prejudice for or against that kind of a defense?" to which the witness responded, "No, sir." Then follows the question: "Should the defense consist in part of emotional or hereditary insanity, aggravated, inflamed, and rendered acute by the excessive use of intoxicating liquors, would you regard that kind of a defense with any disfavor or prejudice?" to which the juror answered, "No, sir."

It is insisted that the juror Williams ought to have been excluded from the panel by reason of his prejudice against the defenses of insanity and drunkenness. When asked if he had any prejudice against the defenses of drunkenness or insanity, the juror answered that to a certain ex-

29-24 WASH.

tent he had. This question is always misunderstood by witnesses or jurors. No man intends to say that he has a prejudice for or against anything which will influence his verdict or action; for, when he says that he will be influenced by his prejudices, he confesses himself unworthy to decide any question, and the juror in this case evidently simply meant, as shown by his whole testimony, that he did not approve of drunkenness, and he said, under certain questions that were asked him by the attorney for the defense, that he would not treat the defense of drunkenness with the same confidence and respect that he would other defenses. But he evidently did not mean what he said; for, when he understood the question as propounded by the court, he said that he would give that defense due effect, and would pass upon such a defense as that the same as he would any other defense, and that it would require no other evidence to prove it than would any other defense. The juror's testimony as a whole shows that he was not disqualified by reason of any prejudice in relation to drunkenness or insanity.

It is insisted that the juror Zaring had such an opinion as should have disqualified him from acting as a juror; but we are not able to see anything in his testimony that distinguishes him from the other jurors. While it is true that he stated that he had an opinion, the whole testimony shows that it was not a fixed opinion, but a mere impression that obtained in his mind from newspaper accounts; for, in answer to the question, "When did you form that opinion?" he said, "When I saw the piece in the paper." No man of common sense forms a fixed opinion in relation to matters of this kind from what he sees in newspapers. The testimony of all of these jurors shows, while not always expressed in so many words, that what they meant to say was that, if the matters and things

which they had read and heard were true, they had an opinion. This was drawn out in most of the cases, the jurors stating that, on the assumption of the truth of what they had heard, their opinions were formed. It is alleged that the juror Erwin was not at the time a qualified elector of the county, but we think the testimony shows plainly that he was.

Assignment No. 19 alleges error of the court in not sustaining the challenge to juror Bowen for the alleged reason that he did not believe that there was such a thing as hereditary insanity. To show the character of the examination that was conducted in this case, we will set out the examination of the juror on that question in full:

"Q. If a part of the defense in this case should consist of an allegation that at the time of the commission of the offense, if any was committed, the defendant was so drunk as to not know what he was about and irresponsible in the eyes of the law for what he did, would you look upon a defense of that kind with any degree of disfavor or suspicion?

A. I don't quite understand you.

Q. Have you any prejudice against the defense of drunkenness in a crime of this kind?

A. No, I have not.

Q. Sure?

A. It would depend on how the man was.

Q. You mean how drunk he was?

A. Yes, sir.

Q. Well, if—do you look with disfavor upon the defendant interposing in his own behalf the defense of drunkenness to a charge of this kind?

A. No.

Q. How is it as to insanity, emotional or hereditary?

A. I do not believe in hereditary insanity.

Q. You don't believe in hereditary insanity?

A. No.

Q. That is a fixed objection with you, is it, that you do not believe there is such a thing as hereditary insanity?

A. There may be such a thing.

Q. You doubt it?

A. I doubt it.

Q. You yourself do not believe there is such a thing?

A. No.

Q. Do you think there is any such a thing as emotional insanity?

A. I think there is.

Q. Have you any prejudice against that sort of a thing as a defense?

A. I don't think so.

Q. You don't think you have?

A. No.

Mr. Griffitts: I challenge this juror for cause and actual bias; he is in such a state of mind with reference to the case and the defense that renders him an unfair and partial juror. I think he discloses that he does not believe there is any such thing as hereditary insanity. I do not want to take up the job in this case of coming here and teaching the juror that there is such a thing as hereditary insanity, and that my defendant has got it. I think he has a fixed belief that there is no such thing as hereditary insanity. In other respects the juror seems fair.

The Court: Do I understand you to say you do not believe there is insanity of that kind that can be transmitted from father to son and mother to son? That a person who is insane cannot transmit that disease to his children?

A. It might be, but I have doubts in my mind about it.

Q. Have you read the question up?

A. No, I have never read it.

Q. If physicians, regular physicians or persons who have made that a study, that question a study, should testify to you here, before you, that it may be, that it is transmitted from an ancestor to his progeny, his posterity, would you believe them and take it and accept it as a truth in this case?

A. I think so.

Q. And go upon it?

A. Yes, sir.

Q. And give it its effect the same as any other fact that may be established?

A. Yes, sir.

The Court: I rather think the juror misunderstood what you meant by hereditary insanity.

Mr. Griffitts: Now, if doctors disagree on the subject, and part of them swear that—

The Court: I don't think the doctors disagree.

Mr. Griffitts: I said if they do. If they don't, it is the only thing they agree on.

The Court: I think they agree; the court can state that as a matter of common knowledge.

Mr. Griffitts: As far as I am concerned, I believe in hereditary insanity, and I have believed in it for a long time.

Q. (Mr. Griffitts) Have you entertained this opinion that there is no such thing as hereditary insanity for a long time?

A. No, only lately, upon hearing about this case.

Q. You have now got a doubt that there is such a thing as hereditary insanity?

A. If I had good proof, I would believe it.

Q. Well, what is the state of your mind now; do you believe there is such a thing or not?

A. In some cases there is such a thing.

Q. In some cases there may be?

A. In some cases there may be, I say.

Q. What I am trying to get at is your belief on the subject, do you believe in hereditary insanity or do you not believe in it?

A. I think I do.

Q. You think you do?

A. Yes, sir.

Q. Didn't you say positively a little while ago that you did not?

A. I said I didn't in all cases.

Q.   Did you mean by that that you did not think that everybody on earth had hereditary insanity, but some fellows may have, is that what you mean?. .

A.   No, sir.

Q.   There would have to be a special cause for it before you would believe it, would there?   .

A.   I would have to have it proven before I would believe it.

Q.   Take pretty strong proof?

A.   Yes, good authority.

Q.   If that authority should be insufficient and leave you in doubt as you are in now, you would still remain with that opinion against the idea?

A.   Not if strong enough.

Q.   Can you tell how strong it would have to be to remove that belief?

A.   As I said, good authority.   .

Q.   Suppose some doctor you didn't like swore there was such a thing as hereditary insanity, would that be authority enough?

A.   Well, if he knew his business.

Mr. Griffitts:   I submit, your honor, that a man that does not believe in the existence of hereditary insanity is a good man to challenge.   I interpose a challenge."

This is a sample of the conduct of the examination of the jurors all the way through.   The jurors frequently did not understand the questions that were propounded to them, and their answers were misconstrued by the counsel for the defense.   When this juror answered that the plea of hereditary insanity would have to be proven before he would believe it, he showed the condition of mind that should obtain with any good juror.   That is all that can be gathered from the whole examination,—that he would demand that such a plea should be proven.   Outside of this, it does not appear from the record that the question of hereditary insanity was a serious question in the case.

The other assignments relate to remarks made by the

court during the progress of the trial and the action of the court in directing a change of counsel during examination, which it is claimed were prejudicial to the defense. An examination of the whole record fails to convince us that the remarks or actions of the court were prejudicial. A more particular review of the circumstances attending the trial which led up to the alleged errors complained of could not be beneficial to any one.

We do not think that any error was committed by the court in relation to the admission of testimony in any particular. An examination of the whole record convinces us that no prejudicial error was committed, and the judgment will be affirmed.

REAVIS, C. J., and FULLERTON, ANDERS AND MOUNT, JJ., concur.