[No. 3785. Decided October 4, 1901.]

STATE OF WASHINGTON, *Respondent,* v. GEORGE R. A. FARRIS, *Appellant.*

HOMICIDE — INSTRUCTIONS — HARMLESS ERROR.

Where a court has fully and clearly charged the jury upon the subject of the character of premeditation and deliberation required under the law to constitute murder in the first degree, the subsequent use of an inapt and meaningless word, in defining to the jury the meaning of the terms "premeditation" and "deliberation," would not constitute reversible error.

JURORS — COMPETENCY.

The fact that a juror has formed an impression as to the guilt or innocence of defendant from having read an account of the homicide in a newspaper and talked about it with his neighbors would not disqualify him, where it appeared that such opinion or impression was a qualified one, which he could disregard absolutely upon the trial of the case.

Appeal from Superior Court, Klickitat County.—Hon. ABRAHAM L. MILLER, Judge. Affirmed.

W. B. Presby and H. S. Wilson, for appellant.

William T. Darch, Prosecuting Attorney, H. Dustin, and A. S. Bennett, for the State.

The opinion of the court was delivered by

REAVIS, C. J.—On the 12th of March, 1900, A. J. Worrell, a farmer residing some twenty-eight miles southeast of Goldendale, was shot and killed. He was at the time plowing with a team of four horses in a field about a mile from his residence. As he did not return to his home in the evening, and, his absence exciting uneasiness, there was search instituted, and his body was found in the afternoon of the 13th. It had been dragged to the point where found, a distance of some forty rods. A rope had been fastened around the feet and the horses with which the deceased was plowing hitched to the rope, and the body thus drawn to the place where found. The coroner held an inquest. It was found that the death was from gun shot wounds made by a ball from a 45-75 caliber rifle. There were thirteen bullet holes in the body caused by at least five shots, one of which had gone into the back of the head, and the others in the back and side of the deceased, two of the shots having been fired after the deceased was in a prostrate position. The track over which the body was dragged had been covered up by plowing. About nine o'clock on the 12th of March, the day of the homicide, the defendant, with the four horses which deceased had been driving to the plow, and riding a white saddle horse, stopped at a farmer's in the vicinity, ate lunch, and fed his horses, and about half past ten o'clock left for his home in Goldendale. Defendant arrived at his home about two o'clock in the morning on the 13th, stayed there about an hour and left home, taking a gun with him,

and went into the mountains where he remained until three
o'clock of the morning of the 14th of March, when he came
to Goldendale and surrendered himself to the deputy sher-
iff.   The facts connecting the defendant with the homi-
cide, other than his admissions, were that previous to the
12th of March he endeavored to procure a gun, and finally
procured the one with which Worrell was shot, a 45-75
Winchester rifle, and that he started from Goldendale on
the day of the homicide, concealing his gun in a blanket;
went to the field in which the deceased was plowing; that
no one observed defendant and deceased together, and that
deceased was killed by defendant.   Upon the trial, which
occupied several days, after the conclusion of the testi-
mony upon the part of the state, defendant was sworn,
and testified in his own behalf.   The state, before it rest-
ed, had shown the homicide as mentioned, and circum-
stances connecting defendant directly with the commission
of the crime.   Defendant admitted the homicide substan-
tially as shown by the state, but alleged self-defense.   In
substance his defense was that he and the deceased and a
brother-in-law of deceased had some controversy over the
possession of premises leased by defendant to the deceased
and his brother-in-law, who were partners; that he went
to settle such controversy with deceased; that he felt some
uneasiness and fear that a difficulty might arise, and armed
himself with a Winchester rifle, and he also had upon his
person a loaded revolver; that, arriving at the field where
deceased was plowing, he left his rifle at the fence, a short
distance from where deceased was plowing, and went to
deceased, and they engaged in conversation; that defendant
had a bottle of whisky with him, and that he and deceased
drank from the bottle; that the controversy between them
was discussed, and he suggested to deceased that he con-

tinue his plowing and reflect upon the adjustment proposed; that deceased plowed around the land and came back and refused to make any settlement, using some offensive language; that he, defendant, then told deceased that he would take two of defendant's horses from the plow which deceased was using, the horses being in possession of deceased under some agreement in the lease which defendant said deceased repudiated; that deceased forbade the taking of the horses, and defendant persisted and unhitched the horses; that immediately deceased, who was a strong man and physically superior to defendant, came after defendant with a whipstock which he had in his hand; that he pursued defendant rapidly, striking at him, and defendant started and reached the place where the gun had been left; that he seized the gun and killed deceased; that defendant was under great fear and excitement at the time, and could not detail the circumstances of the killing or the number of shots fired. There was no other testimony with reference to the homicide. The entire record, including all the testimony adduced at the trial, has been brought here, and, in view of the serious nature of the crime charged, the testimony has all been read. Certain testimony was tendered by defendant and excluded. This testimony was offered to support the plea of self-defense, but the questions propounded all related to contentions between the defendant and the deceased and his brother-in-law relative to the premises leased by defendant to deceased and his partner. The time was too remote to make those controversies relevant, and there was no question but that angry feelings had been existing for a long time between the parties. This sufficiently appeared, without controversy, at the trial. No error is perceived in the admission or rejection of testimony.

The instructions, all together, expressed the law clearly. The definitions of murder in the first and second degrees and of manslaughter were correctly given. We cannot see the pertinency of the requested instruction upon voluntary intoxication, as there was no evidence of any such intoxication. The law of self-defense was intelligibly stated and defendant's theory of the case fairly placed before the jury.

Strong objection is urged against the following language used by the trial court concerning deliberation and premeditation: "Deliberation is the mental operation of weighing motive or consideration that makes for or against an intimation of the proposed act or line of action;" and "Premeditation is the mental operation of thinking upon an act before doing it or upon an intimation before carrying it out." The court, among other instructions, gave the following:

"No. 5. You are instructed that in order to constitute murder in the first degree the jury must be satisfied beyond a reasonable doubt from the evidence not only that the defendant without justifiable cause or legal excuse killed the said A. J. Worrell, but you must further find from the evidence beyond any reasonable doubt that before the defendant inflicted the fatal wound he had formed in his mind deliberate and premeditated purpose to kill the said A. J. Worrell, and that the fatal wound was inflicted with the intention of effecting that purpose.

"No. 6. It is not, however, necessary that the wilful intent, premeditation or deliberation shall exist for any considerable length of time before the assault and killing. The law requires that the assault and the killing shall be done purposely and of deliberate and premeditated malice, a fixed design to take human life unlawfully formed while in the cool state of the blood accompanied with some degree of reflection thereon and the act of killing which follows.

14—26 WASH.

"No. 7. And in this case if you believe from the evidence beyond a reasonable doubt that the defendant feloniously shot and killed the said A. J. Worrell, in manner and form as charged in the information, and that before committing the act, and while his blood was cool he formed in his mind a fixed, wilful design and purpose to take the life of the said A. J. Worrell, and in furtherance of that design and with reflection and premeditation thereon for some appreciable space of time before the doing of the act, and without justifiable cause or legal excuse therefor, then you should find the defendant guilty of murder in the first degree."

It will be observed that the deliberation and premeditation required under the law to constitute murder in the first degree were clearly stated to the jury. The use of the word "intimation" in instructions 10 and 11, above referred to, is not apt, and is almost meaningless, but cannot be misleading in view of the other instructions given, and the instructions (10 and 11) must unquestionably be construed as merely attempting to elucidate what was already clearly expressed in the other instructions. Reversible error cannot be predicated alone upon the ill selection of the word "intimation."

The only error assigned upon the selection of jurors deemed necessary to notice is that of juror Hornibrook. The juror was asked if he had heard anything of the case, and answered affirmatively. The question was then propounded: "From what you have heard have you formed an opinion in regard to the guilt or innocence of the defendant?" Answer: "I don't know but what I have." "Do you think that opinion would affect you in rendering a verdict after hearing the testimony in this case; would it have any effect on your mind?" Answer: "I should think that it would." "You think you could try this case and hear the sworn testimony of witnesses and render a

verdict—fair and impartial verdict in the case; decide it the same as if you hadn't heard anything about it?" Answer: "I think I would." After the above questions and answers defendant's counsel elicited from the juror that he had talked with his neighbors about the case and seen an account of the homicide in the newspapers. He answered, as to any opinion, that he could disregard it; that the opinion or impression that he had was a qualified one, and he would disregard it absolutely; that he did not believe that such qualified opinion would influence him in the consideration of the case. It will be observed that the answers of the juror are not to the same effect as those of juror Kyle in *State v. Murphy,* 9 Wash. 204 (37 Pac. 420), where the juror stated that he regarded what he had already heard of the case as evidence, and had formed an opinion, and that such opinion could not be changed unless other evidence was brought to bear. Or that of juror Kellogg, in *State v. Wilcox,* 11 Wash. 215 (39 Pac. 368), where the juror had talked with a witness and formed an opinion which would require evidence to change. Or that of juror Denniston, in *State v. Rutten,* 13 Wash. 203 (43 Pac. 30), where the juror said he could not say that he would be governed by the evidence brought in the case. Or in *State v. Moody,* 18 Wash. 165 (51 Pac. 356), where juror Shafer had such an opinion as debarred him from entering upon the trial presuming the defendant innocent. In *State v. Lattin,* 19 Wash. 57 (52 Pac. 314), the juror had formed such an opinion that it would require evidence to remove it. The rule has been stated frequently here that the nature of the impression or opinion existing in the mind of the juror must be determined by the court; that, although the juror may declare that he can try the case impartially upon the evidence adduced, yet such declaration is but the

juror's conclusion, and that the court must determine upon his whole examination whether he is in a condition to be impartial, or whether bias may exist, and that the conclusion is within the discretion of the trial court, and such discretion may be reviewed here. *Rose v. State,* 2 Wash. 310 (26 Pac. 264); *State v. Coella,* 8 Wash. 512 (36 Pac. 474); *State v. Gile,* 8 Wash. 12 (35 Pac. 417); *State v. Carey,* 15 Wash. 549 (46 Pac. 1050); *State v. Royse,* 24 Wash. 440 (64 Pac. 742).

The juror Hornibrook answered the question as to an opinion not affirmatively, but negatively,—"I don't know but what I have." It was developed from his subsequent answers that he did not have a fixed opinion; it was merely an impression, such impression as most persons receive who hear from unverified sources the account of a homicide or tragedy. There is a lodgment in the memory of something heard, but no action of the judgment upon purported evidence. The effect of reading such accounts in the newspapers may possibly affect the readers variously. Ordinarily persons of some intelligence and thought, or of experience, understand that such accounts are hastily and superficially gathered, and no considerate reader would form a fixed opinion. Yet others, of less experience and intelligence, may be so influenced by such accounts as to bias the judgment. The court must conclude from the appearance and statements of the juror whether he is free from bias. We are content with the conclusion of the trial court upon the competency of the juror challenged.

The jury passed intelligently upon substantial testimony, and weighed it deliberately.

Perceiving no reversible error upon the record, the judgment is affirmed.

Fullerton, Anders, Dunbar and Mount, JJ., concur.