118 N.J. Super. 38 (1972)
285 A.2d 571
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
ALFRED KELLY, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued September 21, 1971.
Decided January 7, 1972.
*41 Before Judges CONFORD, MATTHEWS and FRITZ.
Mr. Bruno L. Leopizzi argued the cause for appellant.
Mr. Harry Smith, Assistant Prosecutor, argued the cause for respondent (Mr. Joseph D.J. Gourley, Passaic County Prosecutor, attorney).
The opinion of the Court was delivered by CONFORD, P.J.A.D.
This is an appeal from a conviction of murder in the first degree in which the jury recommended and the court pronounced sentence of life imprisonment. Three grounds of appeal have been briefed and argued: (a) failure of the trial court on request of the defense to inquire of the prospective jurors concerning any predisposition as to the defense of insanity; (b) alleged excessive and prejudicial intervention by the trial judge in the cross-examination of one of defendant's medical experts; and (c) refusal of the trial court to permit cross-examination of the State's medical witnesses as to their understanding of the law of insanity as a criminal defense.
Defendant Alfred Kelly, about 64 at the time of the homicide on July 24, 1969, shot to death Adolph Tober, then in his early forties, in the courtyard of the garden apartment house in Paterson of which Tober had been a co-owner since early 1967 and defendant and his wife tenants for several years.
Defendant is a college graduate and a veteran of military service as a United States naval officer in World War II. He had had a career in various employments of moderate compensation and had once failed in a business of his own. At *42 the time of the events here involved he was a new and used car salesman earning under $10,000 per year. He lived with his wife, then about 56, but had no children.
The decedent actively managed the apartment building. He had frequent difficulties with defendant. The latter complained about other tenants he considered undesirable; there were minor matters relating to maintenance of the property. During one confrontation, according to defendant, Tober twisted his arm and said "You're an old man and I could kill you with one hand." About a month prior to July 24 defendant overheard an altercation between Tober and another tenant, Mrs. Schultz, who was friendly with the Kellys, and attempted to intercede. There is evidence that Tober told defendant to move if he didn't like it there, and threatened to evict him; that defendant rushed to strike Tober but was restrained by his wife; that a few minutes thereafter Tober's partner, De Marco, visited defendant to return his fallen eye-glasses and was told by the latter: "Tell him[Tober] to stay away from me  I was taught how to kill these Nazis." Defendant testified, admitting the episode, and that he later sent a letter of apology to Tober, fearing eviction, but he denied use of the language about Nazis.
Defendant, corroborated by his wife, testified that Tober, a married man, had made amorous advances toward Mrs. Kelly and been rebuffed by her. Mrs. Schultz said she had had similar experiences and had told the Kellys. Defendant testified that on the morning of July 24 (a Thursday) while at work he received a phone call from Tober who told him he wanted to see him over the weekend "to settle their differences once and for all." The previous evening Mrs. Schultz had showed defendant a notice to herself and her husband from Tober demanding an increase in rent or termination of tenancy, and asked him to obtain legal advice about it for her. Defendant said he left work for home about 8:30 P.M. on the 24th. He took one drink from a bottle of Scotch he kept in the car (his wife was a "teetotaler" who objected to his keeping liquor at home).
*43 En route home defendant was bumped in the rear by another car and was able to make a notation of the license number. When he arrived home he saw a car parked at the curb with a license number almost identical with his notation and of the same color as that which had bumped his. Tober came over and said it was his car. An argument ensued over defendant's announced intention to report Tober as a "hit-and-run" driver. Tober allegedly grabbed defendant's arm, said he'd be the "sorriest man" in the world if he did so, and implied a threat of eviction. Some aspects of this episode tend to be corroborated by two independent witnesses passing by at the time, as well as by Mrs. Schultz.
Mrs. Schultz testified she saw Tober and defendant talking together on the occasion just mentioned and heard Tober threaten defendant with eviction. Tober left in his car and defendant walked to the house entrance. He seemed "very unstable"; he wanted to talk with her but "couldn't get anything out." He stumbled on the way to his apartment. He couldn't open the door with his key, and she helped him. In his testimony defendant admitted these facts but denied he was intoxicated. (At trial Mrs. Schultz said she didn't then think defendant had been intoxicated but admitted she entertained that opinion on July 24 and had so informed the police after the shooting.)
Defendant testified he went up to his apartment (his wife was not there), took off his clothes and put on his pajamas to relax. He received a phone call from Tober who threatened to come back, rape his wife and kill both of them. He tried to phone the police but couldn't. He became concerned over finding his wife. He has only spasmodic memory for subsequent events. He picked up a loaded gun he kept in his bedroom which he had not touched since buying it two years previously. He remembers being outside the building, firing the gun and hearing two clicks. He doesn't recall seeing or talking to anyone. He remembers going back to the apartment and seeing a police officer there who asked *44 for the gun. He remembers being fingerprinted at the police station but not being questioned by the police.
The State's witnesses established that defendant emerged from the building and walked a few feet past Tober, who was conversing with a tenant. Defendant was heard to say, "I hate him  I hate that guy  I want to kill him." He seemed in a daze, nervous, "looked like he was in a trance." He turned around and shot Tober in the leg. As the latter bent over, crying out, "Kelly, you crazy s.-o.-b.-, you bastard," defendant shot him twice more, exclaiming, according to one witness, "Take this, you s.-o.-b.-." Tober was dead on arrival at the hospital. After the shooting defendant was "quiet, calm as if he was frozen." Some of the witnesses thought defendant was under the influence of liquor. He was dishevelled, without underwear or socks, his shirt misbuttoned (ordinarily he was neat and orderly in his dress).
Defendant's appearance to the arresting officers was as of a "man in a fog," with eyes "glazed." He gave off a "slight odor of alcohol." He was warned of his rights by the deputy police chief at the scene of the killing and responded, "I know, I know, I shot him." While being interrogated at the police station he told the examining officer, "I fully understand what you have told me." The officer didn't think he was "drunk," but "dazed." As they conversed, the daze appeared to clear up. His speech was coherent. He told the officer he and Tober had had arguments the past few months.
Defendant produced three medical experts at the trial. Each testified, on the basis of examination of the defendant and a hypothetical question, that defendant at the time of the crime had a mental disease or disorder which made him unable to appreciate the nature, quality or consequences of his act. Two of them also concluded he could not then differentiate between right and wrong. One of them, Dr. Fraulo, vacillated on that point. Defendant never manifested any mental disorder or tendency toward violence before this incident. He was fully oriented when examined by the experts *45 months after the event. But Doctor Fraulo found him without appropriate "affect" for what he had done and his current predicament.
Dr. Markowitz, a young neurologist with limited training in psychiatry, gave the opinion that defendant at the time of the shooting was in a fugue state, not able to integrate events, acting automatically, not functioning on the normal basis of receiving and organizing information and determining therefrom how to act, and with accompanying amnesia for events.
Dr. Fraulo, a psychiatrist, testified defendant had developed paranoid ideas about Tober which took on delusional form. He had a pre-morbid personality, of obsessive, compulsive character, and an impaired "ego function." At the time of the killing he was in a "dissociated state," where the unconscious takes over from the conscious.
Dr. Berman, a veteran psychiatrist, testified that defendant developed a paranoid condition with the fixation that Tober was his tormentor. By the time of the shooting he had gone into a fugue state, a condition of disassociation, with "separation" between consciousness, awareness and control. There followed "patches" of memory of the events. Consumption of liquor was not a significant factor in inducing the destructive conduct. The fugue state began when he received the phone call from Tober, and recovery therefrom occurred at the police station.
Two psychiatrists testifying for the State, Dr. Brancale and Dr. Campean, on the basis of an extended interview with and examination of defendant, were of the opinion that at the time of the incidents on July 24, 1971 defendant was not suffering from a psychotic disorder, could distinguish right from wrong, and knew the nature and quality of his acts.

I
During the voir dire of the jury panel defendant's counsel made the following request of the court:
*46 If your Honor please, I respectfully request that the Court inquire of the prospective jurors, as to whether or not, if the defense of insanity were advanced by the defendant, do they have any feeling about that, firstly. And, would they accept the defense if the defendant proved it by a preponderance of the evidence, that the defendant did lack the mental capacity to form an intent, or did lack mental capacity to distinguish right from wrong. Would they accept it as a defense, or do they have feelings against this type of defense.
After argument, the court ruled in the negative, saying:
I am of the opinion that the voir dire that I am conducting, and in the manner in which I am conducting it is sufficient to alert the jurors that they are to accept the law from the Court. And, that they are the sole judges of the facts, and were I to keep stressing the insanity defense, that is intended to be interposed, would be giving the defendant more than he is entitled to on the voir dire. Both sides are entitled to a neutral jury and by stressing the defense at this point seems to me that I would be tipping the scales of justice way beyond that which is necessary. Therefore, the application will be denied.
Two renewals of the request during the progress of the voir dire were also denied.
The voir dire in this case was conducted by the court, as required by R. 1:8-3(a) and the philosophy of State v. Manley, 54 N.J. 259 (1969), a decision which marked the end in this State of the extended, time-consuming, argumentative and indoctrinating practice of examination of the veniremen by attorneys which had long held sway here as well as elsewhere. Ibid., passim. Manley evidences a "remedial movement * * * toward adoption of methods designed to restore the fundamental basis for preliminary questioning, i.e., an expedient selection of a fair and impartial jury, one that will decide the case fairly under the evidence presented and the instructions of the court." Manley, at 280.
It is at once apparent that the request here denied goes to inquiry concerning the jurors' attitude toward a defense. Logically, inquiry on such a matter would be difficult to differentiate from inquiry as to jurors' attitudes concerning many other rules of substantive or adjective law which might *47 be involved in the trial. Short of reposing requests for such inquiries in the strict discretion of the trial judge, there is some risk of subverting the objective of Manley to eliminate "efforts to indoctrinate, to persuade, to instruct by favorable explanation of legal principles that may or may not be involved, to lecture on the law and the facts and the relation of one to the other * * *" and to prohibit "the hypothetical question intended and so framed as to commit or pledge jurors to a point of view or a result before they have heard any evidence, argument of counsel or instructions of the court." Manley, at 280-281.
While there is no precedent in this State, under the pre-Manley practice, concerning the right to question veniremen as to attitude toward insanity as a defense, some significance may perhaps be drawn from the circumstance that in Manley the court quoted with approval (54 N.J. at 286) from Commonwealth v. Calhoun, 238 Pa. 474, 86 A. 472, 475 (Sup. Ct. 1913), wherein a closely related question was involved. That question and its resolution by the Calhoun court are indicated by this excerpt from the opinion:
The first two assignments of error concern the examination of proposed jurors on their voir dire. Counsel for the defendant stated the common-law definition of murder to one of the jurors, and then asked, `What do you understand by the words, "a person of sound memory and discretion"?' Another was asked, if the testimony satisfied him that the accused was insane at the time of the crime, and had committed the deed while under the control of an irresistible impulse to take life, `Would you deem him legally responsible for his deed?' The trial judge was clearly right in refusing to allow either of these questions. Counsel may not examine the proposed juror upon his understanding of the law, and that is what these interrogations amounted to. One called to the book as a juror may be asked the broad question whether, if sworn as a trier, he would accept and act upon the law as stated to him by the court; and this is as far as the examination on the voir dire may properly proceed along that line. [86 A. at 474-475]
The segment of the foregoing excerpt approved in Manley is the last sentence thereof. That approval was coupled with approval of rulings in other decisions excluding questions *48 relating to presumption of innocence, character of proof necessary in a criminal case and reasonable doubt. 54 N.J. at 286.
While the question excluded in Commonwealth v. Calhoun, supra, was particularly objectionable as seeking the venireman's probable verdict on a given hypothesis of fact  a tactic universally disapproved  other Pennsylvania Supreme Court decisions have sustained the refusal to permit inquiry as to "prejudice" or "conscientious scruples" against insanity as a defense. Commonwealth v. Barner, 199 Pa. 335, 49 A. 60 (1901); Commonwealth v. Zoltowski, 246 Pa. 410, 92 A. 496 (-1914); cf. Commonwealth v. Moon, 389 Pa. 304, 132 A.2d 224 (1957).
The courts of Massachusetts also permit exclusion of questions addressed to bias against the defense of insanity. Commonwealth v. Ricard, 355 Mass. 509, 246 N.E.2d 433, 434 (Sup. Jud. Ct. 1969), is illustrative. The questions there disallowed were:
Do you believe in psychiatry? Are you aware of any bias or prejudice that would prevent you from believing or accepting testimony given by a psychiatrist as to defendant's mental condition? Do you believe that a person can be insane? If you believe that the defendant is presently sane, would this prevent you, after hearing all of the evidence and the law as given you by the court, from being able to find the defendant insane at the time of the homicide? Are you aware of any bias or prejudice that would prevent you after hearing all the evidence and the law as given you by the court from finding the defendant not guilty of murder in the first degree by reason of insanity?
The Massachusetts court held that the permissibility of such questions lay in the discretion of the trial judge. It explained:
It may not be assumed that there is a general prejudice against psychiatrists and a general rejection of the concept of irresponsibility because of mental illness or defect. There appears slight chance that pre-trial inquiry in respect of the defence of criminal irresponsibility would tend to assure a fairer and more competent jury to judge that issue. When the jurors confront it they will have heard for *49 the first time what the test is (that is, not `insanity,' but that `a person is not responsible for criminal conduct if at the time as a result of mental disease or defect he lacks substantial capacity either to appreciate the criminality [wrongfulness] of his conduct or to conform his conduct to the requirements of law. Commonwealth v. McHoul, 352 Mass. 544, 546-547, 226 N.E.2d 556, 557-558). They will have heard the expert and other testimony. Answers to pretrial questions as to views about insanity and about experts in mental illness would give a very uncertain indication of what the state of mind of the jurors would be after hearing the evidence and proper instructions.
To attempt a pre-trial appraisal that would be significant, the judge would have needed to explain the test to be applied; he would have been obliged in effect to give much of the substance necessary and appropriate in instructions after the evidence was in. This, as a practical matter, would have meant a lecture to the entire venire based on hypothetical facts. Even then there would be absent that understanding that comes from hearing the testimony on direct and cross-examination of the psychiatric experts.

* * * * * * * *
Our rule is founded in the belief that a fair trial is afforded by a jury of twelve citizens impartial as to the persons involved and unprejudiced and uncommitted as to the defendants' guilt or past misconduct. Every individual has impressions and beliefs, likes and dislikes. That those of a particular juror will not be determinative or dominant is reasonably assured by the requirement of a unanimous verdict, the awesome responsibility of the task assigned, the dignity and solemnity of the courtroom where the task is performed, and the careful instructions of the judge not only as to the law to be applied, but also and importantly as to the determination of guilt or innocence on the evidence, free of all extraneous considerations.
A fair jury is one that represents a cross section of community concepts. See Commonwealth v. Subilosky, 352 Mass. 153, 159-160, 224 N.E.2d 197; Irvin v. Dowd. 366 U.S. 717, 722-723, 81 S.Ct. 1639, 6 L.Ed.2d 751; Swain v. Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759; See also Connors v. United States, 158 U.S. 408, 412-414, 15 S.Ct. 951, 39 L.Ed. 1033. Our method of selecting jurors has, we believe, worked well. It has avoided the weeks of pretrial proceedings that are common elsewhere. [246 N.E.2d at 434-435]
We find only one reported decision wherein the refusal of a trial court to allow inquiry into the prospective jurors' attitude toward the defense of insanity was deemed reversible error. State v. Olson, 480 P.2d 822 (Mont. Sup. Ct. 1971). In so holding, the court concluded that:
[t]he serious and complicated defense of insanity should be decided by an impartial jury. How could the defendant be assured of an impartial *50 jury without questioning each juror to see if he could understand the plea and accept it? [at 825]
For reasons to be stated hereinafter we do not agree with the foregoing holding.
It is readily apparent that under the relaxed practices of voir dire examination indulged over the years throughout the country, trial judges have fairly generally allowed inquiries into jurors' atttiudes toward various defenses, including insanity. Except in the Olson case, supra, however, we find no reversals for refusal to allow such inquiries in respect of the defense of insanity. Most of the decisions involve situations where defense counsel unsuccessfully sought to learn whether the jurors would reflect the defense in their verdict if made out  as distinguished from whether they would follow the judge's instructions on the point. And in such cases affirmances uniformly follow. Dicta approving asking the veniremen their attitude concerning the defense are frequent. See State v. Wallace, 170 Or. 60, 131 P.2d 222, 241 (Sup. Ct. 1942); State v. Linders, 224 S.W.2d 386, 388 (Mo. Sup. Ct. 1949); Gammons v. State, 85 Miss. 103, 37 So. 609, 611 (Sup Ct. 1904); Grogg v. State, 231 Md. 550, 191 A.2d 435, 436 (Ct. App. 1963); Cannon v. State, 41 Tex. Cr. R. 467, 56 S.W. 351, 357 (Cr. App. 1900); State v. Royse, 24 Wash. 440, 64 P. 742, 745 (Sup. Ct. 1901); People v. Sowell, 145 Cal. 292, 78 P. 717, 719 (Sup. Ct. 1904); State v. Casey, 34 Nev. 154, 117 P. 5, 11 (Sup. Ct. 1911).
It is clear to us, as said in Ricard, supra, that to embark on productive and useful interrogation of veniremen on voir dire concerning the defense of insanity the trial court would preliminarily have to instruct the witnesses in precise terms as to the legal constituents of the defense. Certainly it could not be presumed, even for purposes of the preliminary issue of capacity and impartiality to serve as jurors, that the jurors know the M'Naghten Rule on the defense of insanity. State v. Lucas, 30 N.J. 37, 68 (1959). There might *51 also be the necessity of distinguishing the defendant's burden on that defense from the State's burden on the criminal charge as a whole. There then would have to follow not simply the inquiry as to existence of a bias or prejudice against the defense, so understood, but the additional determinative inquiry as to whether such bias would prevent the juror from following and applying the instructions the court would furnish the jury at the close of the case. Moreover, experience teaches, as does the voir dire in the instant case on other subjects of inquiry, that veniremen frequently respond to questions ambiguously or otherwise in such manner as to require repeated or amplified versions of the inquiries, often generating considerable ultimate uncertainty as to their state of mind.
The foregoing considerations satisfy us that the objectives of Manley, outlined above, would not be well served by a rule which mandates inquiries of prospective jurors concerning their attitudes as to substantive defenses, particularly insanity, or as to other rules of law which may become implicated in the trial or in the courts ultimate charge. Additionally, the attainment of the objective of a fair and impartial jury must be worked out in the context of the need for reasonably expeditious and efficient conduct of criminal calendars in the interest of the public as well as the parties. This, in our judgment, can best be accomplished by leaving problems such as this one to the discretion of the trial court.
We find no mistaken exercise of discretion here even though the court chose to rest its decision on the undue weighting of the defense of insanity in favor of the defense should the inquiry requested be pursued. We do not find that factor irrelevant to a proper overall consideration of appropriate discretionary factors.

II
We deal next with the matter of the trial judge's intervention in the cross-examination of Dr. Markowitz. This *52 witness was not a practising psychiatrist but a neurologist with limited psychiatric training. He had made a neurological examination of defendant, which proved basically negative, but he undertook as a witness to give the psychiatric opinion mentioned above.
The whole episode of which defendant complains takes some five pages in the transcript and couldn't have lasted more than a few minutes. The judge asked the witness whether on the day in question the defendant knew the difference between right and wrong; whether prior to that day the defendant had a mental disease; whether the events of the day induced mental disease, and what facts made such disease evident to the witness. While the court might better have left development of these matters to the prosecutor, it cannot be said that any of the questions were irrelevant or necessarily beyond justification as attempts by the court to clarify the issues. See State v. Sikora, 44 N.J. 453, 465 (1965). Nor did they in any way demean or disparage the witness.
The next part of the interrogation resulted from inadvertency by the judge and ambivalent answers by the witness. Based upon a prior explanation by the witness, the court asked him as to the source of his information concerning the defendant's attire on the occasion of the shooting, and the witness responded, "The patient advised me. He told me he was told." Not appreciating the import of the last sentence, the judge pursued the matter, whereupon the witness responded affirmatively to the question: "He recalled how he was attired?" This was pertinent to the defendant's claim of partial amnesia. We find no invidious intent on the part of the judge to harm the defendant, but solely to clarify material facts.
There then followed a series of questions from the judge as to the defendant's capacity to premeditate  to which our previous comments as to the questions concerning mental disease would be applicable.
*53 The only perturbing aspect of this interrogatory episode is its final phase  that dealing with the witness' qualifications to express the opinions which he did. It was brief, but the court asked how long the witness was a physician (four years), developed that he practices as a neurologist, not a psychiatrist, and formulated questions which on their surface could be thought to imply a doubt whether a neurologist is able to express an opinion on insanity, as distinguished from diseases of the nerves.
Conceding that the latter phase of the questioning may have implied a doubt by the judge as to the weight of the witness's opinion on the crucial issue under trial  a view which caused defendant to move for a mistrial, which was denied  we cannot conclude that there was such a combination of impropriety and prejudice, on the whole case, as warrants a reversal.
There is no inflexible rule that a judge may not inquire to clarify the extent of a witness's ability to formulate a credible opinion, although it is ordinarily preferable to leave such a matter to counsel. The original qualification of this witness did leave an ambiguity on the record as to whether or not he was a psychiatrist, as distinguished from a neurologist. While, concededly, any licensed physician is qualified as a matter of law to express an opinion as to mental disease or defect, it is generally recognized that psychiatry is a medical specialty entitling opinions within its purview by its practitioners to more weight than those of general practitioners. To this extent the last phase of the interrogation may have had some justification, although we do not affirmatively approve it, and it is worth repeating that, in general, the capacity of a trial judge to influence the outcome of a jury trial is enormous, and he should be on his guard to avoid conveying to the jury his disbelief in a witness or a cause. State v. Guido, 40 N.J. 191, 207 (1963).
There was no prejudice. In addition to Dr. Markowitz defendant adduced the testimony of two psychiatrists of substantially *54 higher qualifications than the former. The jury had the full benefit of the defense proofs on temporary insanity before them, making out a prima facie defense; the case in all other respects was fairly tried, and the judge's charge on the subject of insanity as a defense was full, complete and correct  to the extent that the defense took no exceptions to it whatever.
We conclude that the intervention by the trial court does not, on the whole case, warrant reversal.

III
Defendant's final ground of appeal is that he was not permitted to cross-examine the State's medical witnesses concerning their understanding of the law of exculpation from criminal responsibility for insanity. We find no merit in the contention. The function of an expert is to give an opinion of fact. That opinion either is material in terms of the applicable law or it is not. It is for the jury to apply the expert opinion (if they credit it) in terms of the court's instruction concerning the applicable law. A medical expert's opinion as to the applicable law is of no aid to the jury and could possibly confuse them in light of their duty to apply the law solely as explained by the judge at the end of the case. The State's experts here did testify as to opinions concerning facts which, as against the law, tended to negate the defense of insanity. They were subjected to full cross-examination thereon.
The soundness of the foregoing observations is not lessened by the fact that psychiatrist-witnesses sometimes advert to their understanding of the law on the defense of insanity in the course of their testimony. See State v. Guido, supra.
There was no error in excluding the line of cross-examination undertaken.
Judgment affirmed.