240 N.J. Super. 378 (1990)
573 A.2d 488
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
THOMAS MURRAY, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Submitted February 14, 1990.
Decided April 27, 1990.
*383 Before Judges DEIGHAN, R.S. COHEN and VILLANUEVA.
Thomas S. Smith, Jr., Acting Public Defender, attorney for appellant (Sonia G. Wagner, Designated Counsel, of counsel and on the brief).
Robert J. Del Tufo, Attorney General of New Jersey, attorney for respondent (Robert E. Bonpietro, Deputy Attorney General, of counsel and on the brief).
The opinion of the court was delivered by VILLANUEVA, J.S.C. (temporarily assigned).
*384 The defendant, an inmate at Avenel, was indicted for attempted escape, possession of implements of escape and criminal restraint. At the end of the trial, the court granted the State's application to strike the defense of diminished capacity to the criminal restraint charge, but permitted the jury to consider the applicability of that defense with respect to the first two counts.
On appeal of his conviction on all three counts defendant argues that the court erred by (1) denying his motion to prohibit the State from revealing to the jury where defendant was incarcerated at the time of his purported suicide attempt, as well as his motion to prohibit the State from cross-examining anyone but defendant about defendant's prior convictions; (2) holding that evidence of defendant's prior convictions was admissible for impeachment purposes; (3) refusing to ask the jury certain questions during voir dire concerning psychology, psychiatry and psychologically-related defenses; (4) failing to strike the testimony of a treatment center employee regarding the weapons defendant used in his purported suicide attempt; (5) admitting into evidence photographs of the interior of the treatment center, a photograph of a broom similar to the one defendant used to fashion his weapons, as well as a note used by defendant in his purported suicide attempt; (6) denying defendant's motion for a mistrial based on prosecutorial misconduct because the prosecutor asked the defendant's mental health expert if he was aware that the defense of diminished capacity was subject to being stricken; (7) instructing the jury that defendant had the burden of proving by a preponderance of the evidence that he suffered from a mental disease or defect, N.J.S.A. 2C:4-2, a statute that was held unconstitutional in Humanik v. Beyer, 871 F.2d 432 (3 Cir.1989), cert. den. ___ U.S. ___, 110 S.Ct. 57, 107 L.Ed.2d 25 (1989); and (8) imposing a sentence that was excessive.
*385 The primary issue is whether this court must follow the Humanik decision regarding the State's burden of proof of the defendant's mental disease or defect (N.J.S.A. 2C:4-2) in light of the Memorandum from Chief Justice Robert N. Wilentz stating that said decision should be applied to pending appeals. We hold that this court is bound to follow the law decided in Humanik. However, since the defendant did not offer any competent evidence that he had a mental disease or defect which would negate a state of mind (knowingly) that was an element of the offenses, the court's instruction relating thereto was harmless error.
On September 10, 1985, a Middlesex County Grand Jury returned an indictment charging defendant Thomas Murray with second degree attempted escape, in violation of N.J.S.A. 2C:29-5 and N.J.S.A. 2C:5-1 (count one); second degree possession of implements of escape, in violation of N.J.S.A. 2C:29-6 (count two); and criminal restraint of Corrections Officer Stephen Coraggio, in violation of N.J.S.A. 2C:13-2 (count three). Defendant entered a plea of not guilty to the indictment. After a four-day jury trial the defendant was found guilty on all counts.
At sentencing, after denying the State's motion for the imposition of an extended term, the judge sentenced the defendant to a ten-year term of imprisonment with a five-year period of parole ineligibility on count one, a consecutive seven-year term of imprisonment with a three-year period of parole ineligibility on count two, and a concurrent four-year term of imprisonment on count three. The sentence was imposed consecutive to the sentence defendant was then serving, and an aggregate $90 Violent Crimes Compensation Board penalty was imposed.

FACTUAL BACKGROUND
The defendant was sentenced to a term of imprisonment of 20 years with a period of 10 years parole ineligibility for burglary and aggravated sexual assault. He was committed in June *386 1984 to the Adult Diagnostic and Treatment Center (ADTC) at Avenel, an institution housing repetitive and compulsive sex offenders, where these offenses occurred.
At approximately 6:45 p.m. on May 2, 1985, Officer Stephen Coraggio was seated at his desk at ADTC when he was approached by inmate Nero, who told him that defendant wanted to see him in A Dorm.
Coraggio, who had talked to defendant on previous occasions and had experienced no problems with him, got up from his desk and walked through the gate into A Dorm. It was dark in the dormitory and a night light was on. Coraggio saw defendant standing in the dormitory when defendant demanded that the officer look down onto the bed. Officer Coraggio did so and saw some articles, but defendant then pushed him onto the bed. Defendant then pulled Coraggio up and, when Coraggio asked what was wrong, defendant said that someone in his family had been hurt and that he had to get out. Defendant, who appeared agitated, asked Coraggio if he was to be relieved by Officer Trainor or Officer Flaherty. Coraggio told defendant that he would have to call the control center of the institution for relief, but defendant knew that Coraggio was stalling for time and demanded that the officer lie on the floor so defendant could tie the officer's hands behind his back.
When Coraggio, who was five feet seven inches tall, refused this order, defendant, who was six feet four inches tall, wrenched him up by his left shoulder and moved a sharp pointed object from the officer's back to the right side of his neck. Defendant was in control and understood all the officer had said. Coraggio testified that defendant had two homemade knives which were called "shanks" or "shivs." They were made from supports from a broom handle. Defendant then told Coraggio to look at a piece of paper that he had, which Coraggio did. This note read:
You have exactly three minutes to comply with my demands or I will spill blood. I am neither afraid to kill or be killed. A) One armed escort in a lead car to get me to the hospital that I designate. B) The keys to this particular hostage's *387 car. C) Absolutely no police and no other escort vehicles. If any are encountered I will not be held responsible for the safety of the hostages. You will be informed by the escort car of our destination and our time of arrival. This is not an escape. I merely wish to see my dying cousin before she dies after which I will freely give up all control and hostages. I am not afraid to die. I do not value my life nor that of my hostages. I have set my demands. Now it is up to you to comply. If any attempts are made to use a sniper or any other means to deter me from what I feel I have to do I'd like to please see that I have fastened myself to the officer and that any sudden moves he'll be the first to go. I am serious so do not play any games with me. Don't force me to show just how serious.
Coraggio was able to glance only briefly at the note while defendant verbally demanded an armed escort out of the institution. Defendant became mad and said, "I have ten years to do, I don't care, I have to get out, I like you, Coraggio." Coraggio told defendant that they would walk out of the dormitory together, and the two men proceeded past the officers' area to the wing entrance, with defendant holding Coraggio in front of him with defendant's left arm around the officer's neck and his right arm holding the sharp object to the officer's back.
At the wing gate, Coraggio called out to Officers Trainor and Flaherty, but they did not realize what was happening. After an inmate walked by and went to the hospital area where Flaherty was stationed, Flaherty walked toward the gate. When he got close, Coraggio told Flaherty that he was in trouble and threw the keys that control the wing gate through an open part of the gate.
Once defendant saw the keys he let Coraggio go and went to the east tier of the prison. Flaherty opened the gate and came in. Coraggio then relocked the wing gate and went to the east tier to secure its gate to contain defendant there. Coraggio observed that defendant was behind the gate on the east tier with the receiver to a collect telephone in his hand.
At that point, Captain Michael Morris and other corrections officers arrived on the scene and were advised by Coraggio what had occurred. Coraggio was relieved from duty and sent to the prison hospital but he did not receive any treatment. *388 Later he went to Rahway Hospital complaining of a pain in his back. Morris tried to talk to defendant, who was still locked behind the east tier gate, to find out his problems. Morris noticed that defendant was angry and upset and that he possessed weapons, two sharpened pieces of metal made from pieces of brooms, attached to both his wrists with strings. Defendant said that he had been having problems getting his girlfriend to talk to him. After reviewing defendant's file and consulting with Dr. Samson, a staff psychologist, Morris decided to attempt to isolate defendant to prevent the taking of more hostages. As part of that plan, Morris told defendant that he could use a telephone in the hospital area to call his girlfriend. Defendant, with his homemade knives pointed at himself, cautiously walked to the hospital waiting area with Morris. Morris, who was in the room alone with defendant, unsuccessfully continued to try to get defendant to turn over his weapons. After Morris dialed the telephone and ordered the center keeper to put the call through, defendant agreed to trade one of the knives in order to make the call. Defendant then spoke briefly to a family member in an intelligent and calm manner.
After defendant spoke to the family member, he backed up against the wall in the room. Then Morris had defendant's girlfriend called and, despite her initial reluctance, he ultimately persuaded her to talk to defendant. During the brief conversation between defendant and his girlfriend it appeared to Morris that defendant was receiving the "final word." When the conversation was over, Morris asked defendant to give him the remaining weapon since everything was complete. Defendant then suddenly stabbed at his stomach two or three times, causing some superficial scratches.
After Morris subdued defendant with mace, corrections officers outside the room rushed in to restrain defendant. The second knife was seized from defendant, who was then searched for further weapons. Defendant gave the officers no further trouble, and was later calm and rational, even apologizing *389 to Coraggio before he was transferred to Trenton State Prison.
Defendant did not testify at the trial. Donald Martin, a friend of defendant and a fellow inmate at the ADTC, testified on his behalf that he spoke to defendant during the incident and believed defendant did not really want to escape but instead wanted to "end everything." Dr. Jack Baharlias, an expert in psychology, testified that defendant suffered from a mental disease or defect, a borderline personality disorder with antisocial features and an adjustment reaction with a depressed mood. Dr. Baharlias concluded that defendant was not purposely or knowingly trying to escape, instead defendant was intending to commit suicide by his actions, in that defendant hoped that corrections officers would kill him. Dr. Baharlias admitted that defendant had the capacity and ability to act knowingly but he believed the defendant was not acting purposely or knowingly to effect an escape.
In rebuttal, the State presented Dr. Irwin Perr, an expert in psychiatry, who testified that adjustment disorders and depression were very common among prisoners. Dr. Perr concluded that defendant suffered from no mental disease or defect that would interfere with his ability to act with purpose or knowledge.
At the conclusion of defendant's case, the court granted the State's motion to strike the defense of diminished capacity as to the count three of the indictment (criminal restraint). The court thereafter instructed the jury to consider defendant's diminished capacity defense only in evaluating defendant's culpability under counts one and two of the indictment. The jury returned a verdict of guilty on all counts.

I.
Defendant contends that the trial court erroneously denied his motion to prevent witnesses from mentioning that he *390 was incarcerated at the Adult Diagnostic and Treatment Center (ADTC).
Defendant argues that the mere mention of the name "Adult Diagnostic and Treatment Center" somehow prejudiced him. The trial court denied his motion to prevent the State's witnesses from mentioning the name of the institution in which defendant was incarcerated concluding that it would be an unreasonable burden for the prosecution to try to show official detention in an attempted escape case without mentioning the name of the institution and the restrictions that this institution had imposed upon defendant.
Defendant argues that he was prejudiced because the jury knew he was incarcerated at the ADTC and thus knew he had committed sexual crimes. However, whatever prejudice this knowledge might entail did not substantially outweigh its probative value, which was to establish an essential element of N.J.S.A. 2C:29-5a.
Under Evid.R. 4, whether the probative value of evidence is substantially outweighed by potential prejudice is a decision left the trial judge. State v. Carter, 91 N.J. 86, 106, 449 A.2d 1280 (1982). "On appellate review, the decision of the trial court must stand unless it can be shown that the trial court palpably abused its discretion, that is, that its finding was so wide of the mark that a manifest denial of justice resulted." Ibid. State v. Porambo, 226 N.J. Super. 416, 425, 544 A.2d 870 (App.Div. 1988).
Pursuant to defendant's request, the court properly instructed the jury as to the limited purpose for which they could consider the convictions, i.e., the element of the offense that the defendant was in official detention or incarcerated lawfully on May 2, 1985.
The trial court's limiting instruction eliminated any possibility that the jury would use this evidence in any other manner. Jurors are presumed to follow the trial court's instructions. State v. Manley, 54 N.J. 259, 270, 255 A.2d 193 (1969). Moreover, *391 as the trial court correctly observed, the mere use of the words "Adult Diagnostic and Treatment Center" conveys no negative meaning to the average person, certainly no more than "Trenton State Prison" or any other correctional facility. Therefore, the trial court did not abuse its discretion in denying this motion.

II.
Defendant asserts that the trial court should have granted his motion to prohibit cross-examination about the details of his prior convictions. No details of defendant's prior criminal acts were ever heard by the jury. Thus, no prejudice emanated from the court's ruling.

III.
Defendant alleges that the trial court erroneously exercised its discretion in ruling that his prior convictions[1] would be admissible for impeachment purposes in the event defendant chose to testify. This issue is clearly without merit. R. 2:11-3(e)(2).

IV.
The defendant contends that the court erred in not asking certain questions during the voir dire of the jury.
Prior to trial, defendant submitted a list of proposed voir dire questions to the judge. The judge accepted some questions, modified others and rejected several questions dealing with legal standards and psychological defenses. Defendant asserts that the trial court abused its discretion by refusing to ask 12 questions regarding psychological views.
*392 Voir dire procedures and standards are traditionally within the broad discretionary powers vested in the trial court and "its exercise of discretion will ordinarily not be disturbed on appeal." R. 1:8-3(a). State v. Williams, 113 N.J. 393, 410, 550 A.2d 1172 (1988), quoting State v. Jackson, 43 N.J. 148, 160, 203 A.2d 1 (1964), cert. den. sub nom. Ravenell v. New Jersey, 379 U.S. 982, 85 S.Ct. 690, 13 L.Ed.2d 572 (1965). A judge's refusal to interrogate jurors on a particular form of prejudice does not necessarily constitute reversible error. State v. Long, 137 N.J. Super. 124, 131, 348 A.2d 202 (App.Div. 1975), certif. den. 70 N.J. 143, 358 A.2d 190 (1976); State v. Kelly, 118 N.J. Super. 38, 51, 285 A.2d 571 (App.Div. 1972), certif. den. 60 N.J. 350, 289 A.2d 795 (1972).
Matters relating to jury voir dire rest within the sound discretion of the trial court. See State v. Ramseur, 106 N.J. 123, 243-248, 524 A.2d 188 (1987); State v. Biegenwald, 106 N.J. 13, 27-30, 524 A.2d 130 (1987). One of the primary purposes of R. 1:8-3(a) is to avoid unnecessarily protracted jury examination. State v. Manley, supra, 54 N.J. at 281-282, 255 A.2d 193.
Defendant argues that the questions which the judge did not ask "would have had the effect of compelling the jury to confront and examine their own prejudices and preconceived notions regarding mental illness and psychologically related defenses to crime." However, the questions which the judge asked accomplished this purpose succinctly. The questions the trial court asked probed whether the prospective jurors had read or studied about psychology, psychiatry, medicine, or related fields, and inquired about the jurors' views on those sciences and whether those views would hinder the ability to follow the law as instructed by the court. These questions were sufficient to determine if any jurors had biases for or against mental health professionals and mental state defenses. The remaining questions proposed by defendant were thus completely unnecessary.
*393 Furthermore, some of the rejected questions dealt very specifically with attitudes about matters of law. Whether or not to inquire of prospective jurors about attitudes concerning substantive defenses or other rules of law which may become implicated in a trial or in the charge is within the discretion of the trial court. State v. Manley, supra, 54 N.J. at 269-271, 255 A.2d 193; State v. Talbot, 135 N.J. Super. 500, 512, 343 A.2d 777 (App.Div. 1975), aff'd 71 N.J. 160, 364 A.2d 9 (1976); State v. Kelly, supra, 118 N.J. Super. at 51, 285 A.2d 571. Questions on subjects covered in the court's charge should be rarely allowed. State v. Manley, supra, 54 N.J. at 270, 255 A.2d 193. In this case, the court properly exercised its discretion in limiting the voir dire to questions tending to expose jurors' biases and refusing to ask questions regarding matters of law. This is especially true since the court explained to the jury that it must apply the law as set forth by the court.
The voir dire was sufficiently thorough to assure the selection of an impartial jury. State v. Hunt, 115 N.J. 330, 351, 558 A.2d 1259 (1989); State v. Biegenwald, supra, 106 N.J. at 29, 524 A.2d 130.

V.
The defendant also contends that the court erred when it refused to strike testimony regarding the origin of his weapons and abused its discretion by admitting in evidence photographs of the interior of the ADTC and a broom and the note listing defendant's demands which he gave to his hostage.
These issues are clearly without merit. R. 2:11-3(e)(2).

VI.
Defendant contends that the prosecutor improperly cross-examined the defendant's expert, Dr. Jack Baharlias, and that the trial court erred in failing to grant a mistrial.
*394 On cross-examination, Dr. Baharlias admitted that his initial report did not state that defendant had a mental disease or defect which would negate the mental state for the offenses charged. Dr. Baharlias stated that he subsequently received a telephone call from defense counsel asking for clarification. The prosecutor then asked, "During that conversation were you made aware of the fact that the defense in this case was subject to being stricken because of inadequacy in the report?" Defendant objected and moved for a mistrial. The court denied the mistrial motion, ruling that the inquiry was proper since it focused on the formulation of the doctor's supplementary reports.
When Dr. Baharlias was questioned again, he replied, "I can't answer that question." Dr. Baharlias then explained that defense counsel called him and asked for "clarification" of his report, so he prepared a two-page letter to defense counsel. This letter in large part reiterated the earlier report. Again, the second report did not indicate that defendant suffered from a mental disease or defect precluding the forming of the requisite mental state for the offenses charged.
Dr. Baharlias then testified that after defense counsel had again telephoned him, he prepared a third report. It was Dr. Baharlias' understanding that "it had to do with the legality of language regarding the words purposefully and knowingly." Only at this point did the expert state that because of defendant's depressed mood he was not purposely or knowingly trying to escape.
It is well-established that the scope of cross-examination is a matter for the control of the trial court and an appellate court will not interfere with such control unless clear error and prejudice are shown. Gaido v. Weiser, 227 N.J. Super. 175, 189, 545 A.2d 1350 (App.Div. 1988); Cestero v. Ferrara, 110 N.J. Super. 264, 273-274, 265 A.2d 387 (App.Div. 1970), aff'd 57 N.J. 497, 273 A.2d 761 (1971).
*395 There is no "reason to bar inquiry as to whether the witness had held another opinion, what it was, and why it was changed." State v. Guido, 40 N.J. 191, 206, 191 A.2d 45 (1963).
In the present matter, the prosecutor, in attacking the credibility of Dr. Baharlias' ultimate opinion, established that his initial report did not conclude that defendant suffered from a mental disease or defect which precluded him having the mental state necessary to commit the crimes charged. See N.J.S.A. 2C:4-2. The inquiry challenged here was the prosecutor's attempt to determine if Dr. Baharlias had amended his report because, otherwise, the defense could not be raised in court, thus affecting the expert's credibility. As the Supreme Court in Guido recognized, a change in opinion and the reason for it is a valid basis for cross-examination of an expert witness. Id. at 206, 191 A.2d 45.
As it was, Dr. Baharlias never answered "yes" or "no" because he said he could not answer the question. There was thus no "evidence" with prejudicial effect making it subject to Evid.R. 4. The prosecutor without objection then went on to elicit that the doctor's second report was virtually the same as the first, and that it was not until a third report that Dr. Baharlias concluded that defendant's mental disease or defect had negated the mental state necessary to commit the offenses. These facts were certainly highly probative on the validity of the doctor's conclusion.
The prosecutor properly questioned Dr. Baharlias in areas affecting the credibility of his expert opinion. A mistrial was not justified. State v. Perez, 150 N.J. Super. 166, 171, 375 A.2d 277 (App.Div. 1977), certif. den. 75 N.J. 542, 384 A.2d 521 (1977) (mistrial is an extraordinary remedy granted only to prevent an obvious failure of justice).

VII.
At his trial defendant relied upon the defense of diminished capacity, pursuant to N.J.S.A. 2C:4-2, which states:

*396 Evidence that the defendant suffered from a mental disease or defect is admissible whenever it is relevant to prove that the defendant did not have a state of mind which is an element of the offense. In the absence of such evidence, it may be presumed that the defendant had no mental disease or defect which would negate a state of mind which is an element of the offense. Mental disease or defect is an affirmative defense which must be proved by a preponderance of the evidence.
Defendant alleges, for the first time on appeal, that the trial court's charge to the jury on the defense of mental disease or defect unconstitutionally shifted the burden of proof of the crimes of attempted escape and possession of implements of escape.
The State contends that defendant has waived his right to appellate review of the propriety of the charge since, he not only acquiesced in the instruction, he requested it. R. 1:7-2; R. 2:10-2; State v. Del Fino, 100 N.J. 154, 160, 495 A.2d 60 (1985) (waiver of issue of constitutional dimension); State v. McKnight, 52 N.J. 35, 48, 243 A.2d 240 (1968). Furthermore, it asserts that the charge was proper.
However, after this trial concluded the United States Court of Appeals held in Humanik v. Beyer, supra, that N.J.S.A. 2C:4-2 violated the Due Process Clause of the United States Constitution. Id. 871 F.2d at 441. Defendant argues that this court must follow Humanik and reverse his convictions.[2]
The New Jersey Supreme Court has upheld the constitutionality of this statute on several occasions. For instance, in State v. Breakiron, 108 N.J. 591, 532 A.2d 199 (1987), the defendant *397 argued that N.J.S.A. 2C:4-2 impermissibly shifted to him the burden of disproving an essential element of the crime by denoting the diminished capacity defense as an affirmative one that he had to prove. In asserting a diminished capacity defense, he contended evidence of mental disease or defect is not received in support of a classic affirmative defense, i.e., a justification or excuse for conduct that would otherwise be criminal, but instead is used to create a reasonable doubt concerning an essential element of the offense with which the accused has been charged. Accordingly, the only burden which can be constitutionally placed on the accused with respect to such a defense is the burden to come forward with evidence of a mental disease or defect. Once the accused satisfies this obligation, the issue of mental disease or defect is one for the jury and the State must shoulder the burden of disproving beyond a reasonable doubt either the existence of the disease or defect or its incapacitating effect at the time of the alleged crime.
The Breakiron Court rejected this argument, noting that it was based on a misunderstanding of the statute. Id. at 610, 532 A.2d 199. This conclusion was echoed by the Supreme Court in State v. Zola, 112 N.J. 384, 548 A.2d 1022 (1988), which noted:
[N.J.S.A. 2C:4-2] intends no more than it states  i.e., that the defendant need show only that the condition was present, not that it in fact negated the culpable mental state. To do otherwise would impermissibly shift to a defendant the burden of disproving an essential element of the offense. Id. at 399, 548 A.2d 1022.
In Humanik, however, the United States Court of Appeals held that this instruction was not sufficient to cure the constitutional problem created by the "preponderance of evidence" standard. It summed up the problem this way:
In our view, the Zola charge invites the jury to address first the subsidiary issue of whether the defendant suffered from a mental disease or defect of the requisite kind. If a jury does so and concludes that the defendant has not met his burden of proof by a preponderance of the evidence, we think there are only two possible meanings that jurors could draw from the proposed instruction. They could conclude either that they should assume that such a disease or *398 defect does not exist or that the diminished capacity issue has been dropped from the case. In either event, when the jury reaches the state of mind issue on which the state has the burden of proof beyond a reasonable doubt, the defendant's evidence concerning the existence of a disease or defect will play no role in their decision.... As with self defense evidence, a jury may not be told in this context that the mental disease of defect "evidence must be put aside ... unless it satisfied the preponderance standard." ... If the defendant's evidence on mental disease or defect is sufficient to raise a reasonable doubt about the existence of the requisite intent, it cannot constitutionally be ignored. If a defendant's evidence creates a reasonable doubt about any element of the offense charged, he must be acquitted. Id. 871 F.2d at 443.
In essence, the Humanik court held that any law which places a burden on the defendant to prove a mental disease or defect by a "preponderance of the evidence" violates the Due Process Clause by acting as a "filter" which may bar consideration of that evidence by the jury when the time comes to decide whether the State has proved the requisite state of mind beyond a reasonable doubt.
The State, in its brief filed October 24, 1989, points out that a New Jersey appellate court must follow the decisions of the New Jersey Supreme Court, rather than those of the United States Court of Appeals, on issues involving federal constitutional law. State v. Norflett, 67 N.J. 268, 286, 337 A.2d 609 (1975). However, Chief Justice Robert N. Wilentz, by a Memorandum dated October 27, 1989, instructed Superior Court judges to stop following the State Code and abide by the Humanik decision. 124 N.J.L.J. Index Page 1133 (Nov. 1, 1989). This instruction was prompted in part by a realization that many state criminal convictions may be overturned by future federal habeas corpus proceedings unless state and federal law is harmonized on this issue. The Chief Justice, by Memorandum dated December 8, 1989, has advised that Humanik should also be applied to pending appeals. 124 N.J.L.J. Index Page 1562 (Dec. 18, 1989).
Therefore, this court must follow the mandate of the Supreme Court and apply the Humanik decision to this case.

*399 VIII.
Before a jury issue can arise with respect to the existence of a mental disease or defect, and the absence of the requisite state of mind as a result thereof, a defendant must come forward with competent, reliable evidence about the existence of such a disease or defect which a reasonable juror could credit. Humanik v. Beyer, supra, 871 F.2d at 443. State v. Breakiron, supra, 108 N.J. at 617-618, 532 A.2d 199; State v. Juinta, 224 N.J. Super. 711, 724, 541 A.2d 284 (App.Div. 1988).
Dr. Baharlias diagnosed defendant as "experiencing adjustment reaction with depressed mood" and as having "a personality disorder, borderline type, with antisocial features." Dr. Baharlias opined that these disorders constituted a mental disease or defect. Dr. Baharlias concluded that defendant was not trying to escape but rather "... was trying to manipulate the environment so that he [could] achieve control ... the goals that he had were unspecified and unclear in his own mind ... in the back of his mind he probably had a goal that this would be one way to get out of my life situation ... have somebody kill me."
Dr. Baharlias admitted that defendant was not psychotic or schizophrenic, he understood the difference between right and wrong and he had the capacity and ability to act purposefully and knowingly. He acknowledged that "asking for keys is going through the motions of attempting to escape."
Dr. Baharlias acknowledged that the defendant knowingly and purposefully placed Coraggio in a circumstance exposing him obviously to serious bodily injury (with the use of two knives) because it was necessary in order to provoke the homicidal response. He said that the defendant designed to bring about a desired end rather than a genuine attempt at escape.
Dr. Baharlias said "as part of what he (defendant) did (acts of defiance against the system) he wanted the corrections officers to kill him, that he wanted to commit suicide and that was part *400 of the way he chose in which to do it.... His behavior was an attempt at getting the State to commit homicide upon him through this attempted escape  that his main goal was not to escape from prison."
Dr. Baharlias testified that the disagreement between the State and himself was what defendant's purpose was when he restrained Officer Coraggio with the use of knives.
This is not a case where defendant's alleged mental disease or defect prevented him from forming a mental state; this is simply a case where defendant's psychologist claimed defendant was intending something else. Whether the purported attempt to commit suicide, as claimed by Dr. Baharlias, was "a clear conscious level or perhaps a lower level of awareness" is irrelevant.
The defendant assaulted the officer by knocking him to the bed, wrote the note listing his demands, obtained his weapons and took the officer hostage. In a light most favorable to defendant, his psychology expert said that the defendant did everything to indicate to everyone that he was making an attempt to escape, with weapons, creating all the consequences related thereto, while having a secret agenda to fail and die in the attempt.
This scenario does not bar or negate a finding of knowingly doing the act that one intended to convince the world he was doing.
For example, would not a person be guilty of robbing a bank while armed if he entered the bank displaying a gun with the hope that a guard would shoot and kill him, grabbed money and ran out of the bank, went home depressed and hopeless  but with money?
This is especially so if the perpetrator was not even aware that suicide was his real motivation, but rather he consciously wanted to rob a bank.
*401 An intent to shoot a man holding a baby sufficed to supply the intent element of the offense of atrocious assault and battery on a baby, who was also wounded by the bullet. State v. Humphreys, 99 N.J. Super. 534, 240 A.2d 680 (App.Div. 1968). This does not constitute a mental disease or defect. That defendant claimed, as did the defendant's expert herein, that he intended a different result. The use of the expert witness in this case was an elaborate method of eliciting testimony that defendant intended not to escape but to have himself killed. The expert fully agreed that defendant had the capacity to act purposefully and knowingly. The only dispute was as to what the expert thought defendant hoped would happen.
The intent with which a criminal act is done determines the legal character of its consequences. This doctrine, by its very terms, applies to cases where the consequences of the criminal act differ from those intended by the criminal. State v. Humphreys, supra, 99 N.J. Super. at 536, 240 A.2d 680; State v. Gallagher, 83 N.J.L. 321, 85 A. 207 (Sup.Ct. 1912).
If a defendant acts purposefully or knowingly, he does not necessarily have to "intend" to cause a certain result. State v. Rovito, 99 N.J. 581, 584, 494 A.2d 309 (1985).
Diminished capacity does not seek to excuse the defendant from criminal responsibility. Rather, the concept refers to evidence that, in theory, affects the presence of essential mental elements of the crime. State v. Breakiron, supra, 108 N.J. at 601, 532 A.2d 199: "For the purpose of determining criminal guilt, diminished capacity either negates the state of mind required for a particular offense, if successful, or it does not." Id. at 609, 532 A.2d 199.
There was no competent evidence that the defendant suffered from any mental disease or defect which would negate the culpable mental state of knowingly attempting to escape when he possessed the two knives, which certainly were useful for escape.
*402 The evidence at trial proved beyond a reasonable doubt that defendant was attempting to escape and possessed implements for that escape.
Thus, the "defense" of mental disease or defect was not in the case. Even applying the ruling in the Humanik case, the erroneous jury instruction was harmless beyond a reasonable doubt.

IX.
The defendant's contention that the sentence violated sentencing guidelines and was excessive is unfounded.
His aggregate sentence was 17 years in prison with an eight-year parole ineligibility period.
He was convicted of attempted escape, a crime of the second degree, pursuant to N.J.S.A. 2C:29-5 and N.J.S.A. 2C:5-1, and received a sentence of ten years, the maximum term of imprisonment, pursuant to N.J.S.A. 2C:43-6a(2), with a period of five years parole ineligibility, the maximum period pursuant to N.J.S.A. 2C:43-6b.
He was sentenced to the presumptive term of seven years for his conviction of possession of implements of escape, a crime of the second degree, and was given the statutorily-mandated minimum term of three years parole ineligibility, pursuant to N.J.S.A. 2C:29-6a(2). He also was sentenced to the presumptive term of four years for his conviction of criminal restraint.
Defendant argues that there was no basis for imposing the maximum period of parole ineligibility on count one. While it is true that a period of parole ineligibility is "the exception and not the rule," State v. Kruse, 105 N.J. 354, 359, 521 A.2d 836 (1987), quoting State v. Martelli, 201 N.J. Super. 378, 382-383, 493 A.2d 70 (App.Div. 1985), such a sentence is permitted when the court is clearly convinced that the aggravating factors substantially outweigh the mitigating factors. N.J.S.A. 2C:43-6b. After considering the defendant's prior *403 record, the risk of future offenses, the nature and circumstances of the offense, the "very substantial need" to deter prison escapes and the meritless mitigating factors suggested by the defendant, the judge was "clearly satisfied" that the aggravating factors substantially outweighed the mitigating factors so he imposed a period of parole ineligibility.
Additionally, defendant's contention that his consecutive sentences were in violation of State v. Yarbough, 100 N.J. 627, 498 A.2d 1239 (1985), cert. den. 475 U.S. 1014, 106 S.Ct. 1193, 89 L.Ed.2d 308 (1986), has no basis because there can be no free crimes in a system for which the punishment shall fit the crime. Id. at 643, 498 A.2d 1239.
Imposing consecutive terms for attempted escape and possession of implements of escape does not constitute an abuse of discretion.
The legislature recognized that mere possession by an inmate of a weapon which may be useful for escape is a serious offense in itself by making it a second degree crime with a mandatory three-year parole ineligibility. N.J.S.A. 2C:29-6a(2).
An appellate court will exercise that reserve of judicial power to modify sentences if there is such a clear error of judgment that it shocks the judicial conscience. State v. Ghertler, 114 N.J. 383, 388, 555 A.2d 553 (1989). The test is not whether a reviewing court would have reached a different conclusion on what an appropriate sentence should be; it is rather whether, on the basis of the evidence, no reasonable sentencing court could have imposed the sentence under review. Ibid.; State v. Roth, 95 N.J. 334, 365, 471 A.2d 370 (1984). State v. Bryant, 117 N.J. 495, 569 A.2d 770 (1990) (slip opinion).
Since the sentencing judge properly and carefully weighed the aggravating and mitigating factors and imposed a sentence that was within statutory bounds, there is no basis for this court to disturb the sentence.

*404 X.
Affirmed.
NOTES
[1] 1979 California conviction for second degree burglary, 1980 New Jersey conviction for assault with intent to rape, and 1984 New Jersey conviction for burglary while armed and two counts of aggravated sexual assault.
[2] At the conclusion of the defendant's case, the State moved to strike the defense of diminished capacity on count three, noting that defendant's expert had admitted that defendant had intended to criminally restrain Officer Coraggio. The court granted the motion.

The court thereafter instructed the jury to consider defendant's diminished capacity defense only for the purpose of evaluating his culpability under count one (attempted escape) and count two (possession of implements of escape) of the indictment. Since defendant has not appealed this decision, his argument regarding the constitutionality of N.J.S.A. 2C:4-2 is relevant only to his convictions under count one and count two.